863 A.2d 505

COMMONWEALTH of Pennsylvania, Appellee.

v.

Terrance WILLIAMS, Appellant.

Supreme Court of Pennsylvania.

Submitted June 6, 2000.

Decided Dec. 22, 2004.

58

Michael Wiseman, Philadelphia, James Moreno, for Terrance Williams, appellant.

Hugh J. Burns, Philadelphia, for the Com. of PA, appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice EAKIN.[1]

Terrance Williams appeals from the order denying his petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546.

On June 11, 1984, appellant and Marc Draper lost their money gambling on a street corner. Appellant left to get money from the victim, Amos Norwood, and returned with $10. Later, Norwood drove up to the two. Appellant told Draper they were going to take some money from Norwood, and the three men left in Norwood's car. Appellant directed Norwood to a secluded area where he and Draper forced Norwood out of the car, bound and gagged him, and then took money and other items from him. Appellant, with a tire iron, and Draper, with a wrench, beat Norwood to death and fled. Later that night, appellant returned and burned the body.

On February 3, 1986, a jury convicted appellant of first degree murder, robbery, and conspiracy. After a penalty hearing, the jury found two aggravating circumstances: (1)

---

1. This case was reassigned to this author.

appellant committed the killing while perpetrating a felony;[2] and (2) appellant had a significant history of felony convictions involving the use or threat of violence to the person.[3] The jury, after considering the mitigating evidence presented,[4] found no mitigating circumstances, and sentenced appellant to death. *See* 42 Pa.C.S. § 9711(c)(iv).

Newly assigned counsel filed post sentence motions, including claims of trial counsel's ineffectiveness. The motions were denied after a hearing; appellant filed a direct appeal to this Court, which affirmed the judgment of sentence. *Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75 (1990).

Appellant filed a *pro se* PCRA petition in 1995; new counsel was appointed and filed an amended petition in 1996. After hearings, argument, and a careful review of the record, the PCRA court denied appellant's petition. New counsel was appointed and this appeal followed.

Appellant raises 23 issues in his brief which have been reordered for ease of discussion:[5]

1. Was trial counsel ineffective for failing to investigate and present significant indicia of appellant's incompetency?

2. Did the Commonwealth use its peremptory strikes in a racially discriminatory manner, thus depriving appellant of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 9, 13, & 26 of the Pennsylvania Constitution? Was appellant denied a

**2.** 42 Pa.C.S. § 9711(d)(6).

**3.** *Id.*, § 9711(d)(9).

**4.** Defense counsel presented mitigating evidence of appellant's age at the time of the crime, *id.*, § 9711(e)(4), and appellant's character and record, *id.*, § 9711(e)(8).

**5.** This Court is aware of the felt need to leave no stone unturned when counsel presents a capital appeal. However, we note that the quality of representation is not measured by the number of issues raised. It is not necessary to raise patently unavailing matters in order to ward off fears of a later finding of ineffectiveness; a good attorney will not disguise and thus weaken good points by camouflaging them in a flurry of makeweight issues which clearly have no merit.

full and fair opportunity to litigate his claim? Were all prior counsel ineffective for failing to litigate this claim?

3. Did the prosecutor use false evidence during the guilt phase of the trial? Were all prior counsel ineffective for failing to litigate this claim?

4. Did the prosecution fail to disclose portions of plea agreements with two prosecution witnesses? Were all prior counsel ineffective for failing to litigate this claim?

5. Did the trial court err when it failed to grant a motion for mistrial made after the Commonwealth failed to provide discovery concerning an identification of appellant by the victim's wife? Were all prior counsel ineffective for failing to litigate this claim?

6. Were references to cocaine and to appellant's incarceration contained in letters allegedly written by appellant improperly admitted at trial? Were all prior counsel ineffective for failing to litigate this claim?

7. Did the trial court err when it denied a mistrial motion based upon the Commonwealth's repeated efforts to present testimony concerning appellant's intent to deceive at the time he provided handwriting exemplars? Were all prior counsel ineffective for failing to litigate this claim?

8. Did the trial court err when it denied a motion for mistrial based upon the prosecutor's prejudicial statement made in front of the jury? Were all prior counsel ineffective for failing to litigate this claim?

9. Did the prosecutor make an improper and prejudicial reference to appellant's failure to call witnesses at trial? Were all prior counsel ineffective for failing to litigate this claim?

10. Were all prior counsel ineffective for failing to litigate the impropriety of the prosecutor's summation in which her personal opinion was expressed concerning the credibility of appellant's testimony?

11. Did the trial court's accomplice instructions, which implied appellant was involved in the commission of the offense

when the defense asserted was alibi, violate appellant's right to due process? Were all prior counsel ineffective for failing to litigate this claim?

12. Was trial counsel ineffective at capital sentencing? Were prior counsel ineffective under the same standards for failing to litigate trial counsel's ineffectiveness?

13. Did the application of the "D6" aggravating circumstance to appellant, who the jury may have found guilty as an accomplice, violate the plain meaning of the death penalty statute, and result in the arbitrary and capricious imposition of a death sentence? Were all prior counsel ineffective for failing to litigate this claim?

14. Is Pennsylvania's "significant history" of violent felony convictions aggravating circumstance unconstitutionally vague on its face and as it was applied to appellant? Were all prior counsel ineffective for failing to litigate this claim?

15. Did the constitutional infirmities in appellant's prior conviction result in an arbitrary and capricious finding of the "significant history" aggravating circumstance? Were all prior counsel ineffective for failing to litigate this claim?

16. Did the prosecutor knowingly use false evidence during the penalty phase? Were all prior counsel ineffective for failing to litigate this claim?

17. Did the prosecutor improperly inject her personal opinion regarding the propriety of the death penalty? Were all prior counsel ineffective for failing to litigate this claim?

18. Is appellant entitled to sentencing phase relief because the trial court's penalty phase jury instruction violated *Mills v. Maryland*? Were all prior counsel ineffective for failing to litigate this claim?

19. Did the trial court's failure to instruct the jury that "life imprisonment" means life without possibility of parole violate appellant's constitutional rights? Were all prior counsel ineffective for failing to litigate this claim?

20. Was appellant's death sentence a product of improper racial discrimination in violation of the Pennsylvania capital

sentencing statute, the Pennsylvania Constitution, and the United States Constitution? Were all prior counsel ineffective for failing to litigate this claim?

21. Did the "proportionality review" performed by this Court violate due process and deny appellant meaningful appellate review? Were all prior counsel ineffective for failing to litigate this claim?

22. Were all prior counsel ineffective for failing to litigate the claims raised in this appeal?

23. Is appellant entitled to relief from his conviction and sentence because of the cumulative effect of the errors described herein?

To be entitled to relief under the PCRA, appellant must show, as to each claim, that the allegation of error has not been previously litigated or waived, 42 Pa.C.S. § 9543(a)(3), and that "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.*, § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue...." *Id.*, § 9544(a)(2).[6]

 Appellant's claim that the trial court's penalty phase jury instruction violated *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), has been previously litigated on direct appeal. *Mills* requires a death sentence be vacated if there is a substantial probability the trial court's jury instruction could have led reasonable jurors to conclude they could only consider those mitigating factors which they unanimously found to exist. *Id.*, at 384, 108 S.Ct. 1860. On direct appeal, this Court relied on *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989), which held where jury instructions stated a unanimous verdict is necessary to impose a death

---

6. Issues 3, 4, 5, 6 and 17 were raised in post trial motions and decided adversely to appellant. However, since the highest court in which appellant was entitled to review as a matter of right has not ruled on the merits of these issues, they are not previously litigated. *See* 42 Pa.C.S. § 9544(a)(2).

sentence, no further instruction is required regarding the fact that mitigating factors need not be found unanimously, since Pennsylvania's death penalty statute does not require unanimity in establishing mitigating circumstances. *Williams*, at 82. Accordingly, we rejected appellant's *Mills* claim, and he is not entitled to revive it under the PCRA.[7] *See Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 939 n. 2 (2001) (appellant cannot obtain post conviction relief of claims previously litigated on direct appeal by alleging ineffectiveness of prior counsel and presenting new theories of relief).

■ Appellant's claim that the aggravating factor in § 9711(d)(6) (killing committed during perpetration of felony) was improperly applied to him because he was an accomplice has also been previously litigated. On direct appeal, this Court addressed appellant's argument that this aggravating circumstance did not apply to him "because there was no proof presented that appellant, rather than his co-brutalizer, Draper, landed the fatal blow." *Williams*, at 83. This Court concluded: "This argument, when raised in the context of the penalty stage, does not even reach the level of speciousness; it is simply ludicrous." *Id.* We will not address the same claim, cloaked in a different theory of relief, in the collateral setting.[8]

---

7. Furthermore, the United States Supreme Court recently held *Mills* does not apply retroactively. *See Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). Since appellant's trial occurred in 1986, two years prior to *Mills*, the rule in *Mills* does not apply to his case.

8. Appellant contends *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657 (1998) (plurality), mandates reversal of his death sentence. *Lassiter* held "[§ ] 9711(d)(6) may not be applied to an accomplice who does not 'commit' the killing in the sense of bringing it to completion or finishing it." *Id.*, at 662. However, aside from the fact *Lassiter* was decided after appellant's judgment of sentence became final, the jury also found appellant had a significant history of violent felony convictions. Thus, another aggravating circumstance, § 9711(d)(9), existed, and no mitigating circumstances were found; the penalty would still have been death. *See Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832, 842 (1986) (since jury found one aggravating circumstance and no mitigating circumstances, death sentence upheld even though another aggravating circumstance is held invalid) (citing *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730, 738 (1984)); *see also* 42 Pa.C.S. § 9711(c)(1)(iv).

All except two of appellant's remaining issues assert trial counsel's ineffectiveness during the guilt and penalty phases, as well as appellate counsel's ineffectiveness for failing to raise these issues on direct appeal. Any alleged error during the guilt and penalty phases has been waived because of trial counsel's failure to raise it; however, appellant may still obtain relief for trial counsel's ineffectiveness if he is able to demonstrate appellate counsel was ineffective for failing to pursue the claims. *See Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 656 (2003) (citing *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1022 (2003) (when court is faced with "layered" ineffectiveness claim, only viable ineffectiveness claim is that related to most recent counsel, appellate counsel)).

■ We set forth the standard for preserving such "layered" ineffectiveness claims in *McGill* and *Rush:*

In order to preserve a claim of ineffectiveness, a petitioner must *"plead,* in his PCRA petition," that appellate counsel was ineffective for failing to raise all prior counsel's ineffectiveness. Additionally, a petitioner must *"present* argument on, i.e. develop each prong of the *Pierce* test" as to appellate counsel's deficient representation. "Then, and only then, has the petitioner preserved a layered claim of ineffectiveness for the court to review; then, and only then, can the court proceed to determine whether the petitioner has proved his layered claim."

*Rush*, at 656 (citations and footnote omitted); *see also McGill*, at 1021–23.

■ The *"Pierce* test" requires appellant to prove, with respect to appellate counsel's performance, that: (1) the underlying claim of trial counsel's ineffectiveness has arguable merit;[9] (2) appellate counsel had no reasonable basis for

9. An assessment of this prong requires appellant to establish each *Pierce* prong with respect to trial counsel's performance; failure to establish any one of the prongs concerning trial counsel will defeat the entire claim. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000) (citing *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 441 (1999)). This "merit" prong has been referred to as containing a

failing to pursue the claim; and (3) but for appellate counsel's ineffectiveness, the result on direct appeal would have differed. *See McGill,* at 1022–23. This "performance and prejudice" test was first enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and was recognized in *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987), as the proper test under the Pennsylvania Constitution. Failure to satisfy any prong of the test will defeat an ineffectiveness claim. *Basemore,* at 738 n. 23 (citing *Rollins,* at 441) (ordinarily, post conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet single one of three prongs for claim).

■ Appellant has met the pleading requirement with respect to his remaining issues, as he alleges the ineffectiveness of both trial and appellate counsel. In his statement of questions presented, appellant inserts boilerplate ineffectiveness claims into many of his issues, asserting all prior counsel were ineffective for failing to litigate the issue. Appellant also includes a general boilerplate assertion of "all prior counsel's" ineffectiveness as a separate issue. He presents argument concerning his underlying claims of trial counsel's ineffectiveness, thus satisfying the first prong of *Pierce* with respect to appellate counsel. However, he fails to develop the remaining two prongs concerning appellate counsel's stewardship; thus, he has failed to preserve his claims of appellate counsel's ineffectiveness as required by *McGill.*

■ Where the appellant has established the arguable merit of his underlying claim of trial counsel's ineffectiveness, remand may be warranted for the opportunity to correct his deficient pleading of the remaining two prongs regarding appellate counsel's ineffectiveness. *Rush,* at 657.

Nevertheless, there is simply no need to remand a PCRA petition when the petitioner has not carried his *Pierce* burden in relation to the underlying claim of trial counsel's ineffectiveness, since even if the petitioner were able to

"nested" argument—trial counsel's performance must be addressed in order to determine whether appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. *See Rush,* at 656.

craft a perfectly layered argument in support of his claim, the petitioner's claim would not entitle him to relief. *Id.*, at 657–58. Thus, we need not remand if appellant has not met his burden of proving his underlying claims of trial counsel's ineffectiveness.

As discussed below, appellant has not demonstrated his entitlement to relief on any of these underlying claims. Since all of appellant's underlying claims of trial counsel's ineffectiveness fail, his claims of appellate counsel's ineffectiveness are necessarily defeated as well. *McGill*, at 1023. Therefore, we need not remand in order for him to develop the remaining two prongs of *Pierce* with respect to appellate counsel. *See Rush*, at 657–58; *McGill*, at 1025.

Appellant first claims trial counsel was ineffective for failing to raise the issue of his competency to stand trial. Although no separate competency hearing was held, the issue was addressed at appellant's PCRA hearing, in conjunction with his claim that counsel should have presented psychiatric mitigating evidence. The PCRA court reviewed the following evidence: a 1985 presentence psychiatric evaluation, for an unrelated offense, conducted 10 months prior to trial for the instant offense, which stated appellant was competent to proceed to sentencing; a defense expert's testimony that there was not enough information in the presentence report to determine competency, but appellant "may have been" impaired in his ability to assist counsel; another defense expert's testimony that appellant was not chronically psychotic, but that his ability to talk with his attorney about his past was impaired by his post traumatic stress disorder; two defense experts' testimony that appellant suffered no substantial organic impairment; defense counsel's testimony that although appellant had the opportunity to enter a plea bargain and receive a life sentence, appellant insisted he was not guilty and wanted to go to trial; and the entire trial record.

The PCRA court weighed all the evidence before it and concluded the presentence evaluation was most relevant, as it was conducted closest in time to appellant's trial; the current

opinions of the defense experts concerning appellant's mental state at trial 12 years ago were, appropriately, afforded less weight. Furthermore, these experts had been retained for the purpose of evaluating appellant's claim that trial counsel should have presented psychiatric mitigating evidence, not to evaluate appellant's competency to stand trial. Most significantly, the testimony of defense counsel and the trial record revealed that while appellant may have been troubled at the time of his trial, he was not suffering from any mental impairment which would have rendered him unable to understand or participate in the proceedings. *See* 50 Pa.C.S. § 7402(a) (person is incompetent to stand trial when he is substantially unable to understand nature or object of proceedings against him or to participate in his own defense). We perceive no abuse of the PCRA court's discretion in making this determination; accordingly, appellant is not entitled relief.

Appellant next claims the prosecutor exercised her peremptory challenges in a racially discriminatory manner, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant also claims he should have been permitted to view the prosecutor's notes from *voir dire,* in order to establish his claim of purposeful discrimination. Appellant's claim is a derivative one, raised in the context of ineffective assistance, since trial counsel did not raise a *Batson* objection during *voir dire.* In *Commonwealth v. Uderra,* 862 A.2d 74, 2004 Pa. Lexis 2499 (2004), this Court held, "[I]n order to succeed on an unpreserved claim of racial discrimination in jury selection, . . . a post-conviction petitioner may not rely on a prima facie case under *Batson,* but must prove actual, purposeful discrimination by a preponderance of the evidence, . . . in addition to all other requirements essential to overcome the waiver of the underlying claim." *Id.,* at 87, 2004 Pa. Lexis at 28–29 (citation omitted).

Beyond baldly asserting the prosecutor used 14 of 16 peremptory strikes against African–American jurors, appellant has not made the requisite showing. He provides no information concerning the race of the jurors who were ac-

ceptable to the Commonwealth but stricken by the defense, nor does he provide the racial composition of the final jury. However, the PCRA court noted its own records reflected that, of a possible 20 peremptory challenges, 14 were used against African–Americans, two were used against Caucasians, and four were unused. Furthermore, out of 111 venire persons, 43 were African–American, and the final composition of the jury was five African–Americans and seven Caucasians. Based on these facts, the PCRA court properly concluded appellant had failed to establish he was entitled relief.[10]

Appellant's next claim focuses on the prosecutor's impeachment of defense witness Portie Robinson, who testified on direct examination that his fellow inmate, Marc Draper, had told him someone other than appellant committed the murder with him. To establish Robinson's bias against Draper, the prosecutor attempted to show Draper's father, a police officer, had participated in an investigation which led to Robinson's convictions. When Robinson denied this, the prosecutor presented the rebuttal testimony of the prosecutor from Robinson's trial, who stated he had provided Robinson's attorney with the name of Draper's father.

Appellant contends this rebuttal testimony was false; he argues Draper's father was never listed as a Commonwealth witness. However, the record belies appellant's argument; Draper's father was never called as a witness, so his name was not on the Commonwealth's witness list, but rather was given to defense counsel during an informal conversation, identifying him as one of the investigating officers. N.T. Trial, 1/31/86, at 1522–24. Accordingly, appellant's claim is meritless.

10. Appellant asserts the prosecutor's notes were essential to him at the PCRA hearing, because the prosecutor referred to them during her testimony and used them to prepare her testimony, and because they were relevant to the issue of whether she exercised racial bias in selecting the jury. However, the PCRA court permitted appellant to inspect a summary of the prosecutor's notes, from which she testified; appellant does not explain why the summary was an insufficient aid in his cross-examination of the prosecutor, and fails to demonstrate exceptional circumstances existed which required production of the actual notes. 42 Pa.C.S. § 9545(d)(2) ("No discovery, at any stage of proceedings under this subchapter, shall be permitted except upon leave of court with a showing of exceptional circumstances.").

Appellant next claims the prosecutor failed to disclose to appellant, or to the jury, the full terms of co-defendant Marc Draper's plea agreement and the complete criminal history of Commonwealth witness Renee Rucker. Draper received a life sentence in exchange for pleading guilty to second degree murder and agreeing to testify against appellant. Appellant contends there were other charges against Draper arising from a previous robbery he had committed with appellant which the Commonwealth agreed to *nolle pros* in exchange for his testimony. This contention is meritless; other than his own assertion, appellant provides no support for this allegation. The record reveals Draper's full plea agreement was read into the trial record, and Draper acknowledged it was the full extent of his agreement. N.T. Trial, 1/22/86, at 661–63. Appellant's uncorroborated allegation does not entitle him to relief.

Appellant contends Renee Rucker was not cross-examined concerning her prior *crimen falsi* convictions under a different name. Appellant points to the fact there were two listings for "Renee Rucker" in Philadelphia County's data base, and one listing also had an alias and included four theft convictions. However, appellant acknowledges these two listings have different photo identification numbers, and he fails to show they are actually the same person. Thus, appellant's claim fails.

Appellant's next issue focuses on his identification by the victim's wife, Mamie Norwood. At trial, Mrs. Norwood testified she had seen appellant on her front porch the night of the murder. Appellant contends that, prior to trial, there was no indication this witness could identify him; however, during trial preparation, the prosecutor was informed the witness recognized appellant as the man on her porch, after seeing his picture in the newspapers three or four weeks before trial and then seeing him at the preliminary hearing. Appellant argues the trial court should have granted a mistrial because the defense was not notified of the witness's ability to identify appellant, and was thereby deprived of the opportunity to file a suppression motion.

"A defendant seeking relief from [a] discovery violation must demonstrate prejudice in order to be entitled to a new trial." *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 512 (1995) (citation omitted). It appears from the sidebar discussion concerning this issue that the witness's ability to identify appellant was not known to the Commonwealth until one month before trial, when Mrs. Norwood mentioned the photos in the paper while being interviewed by the prosecutor in preparation for trial. *See* N.T. Trial, 1/14/86, at 191–94. The witness's trial testimony reveals she was never asked to identify the man on her porch, and she did not come forward with her recognition of appellant's newspaper photo until after the preliminary hearing. *Id.*, at 129–30. There is no indication this information was deliberately withheld by the Commonwealth, nor has appellant demonstrated he was prejudiced by not being able to move for suppression of this testimony. Nothing in the record warrants the conclusion this identification was obtained by suggestive means or by any other means in violation of appellant's constitutional rights; therefore, a motion to suppress would have been futile. Finally, trial counsel vigorously cross-examined Mrs. Norwood concerning the conditions under which she saw the man on her porch, her initial inability to identify him, and her subsequent identification of appellant as that person. *See id.*, at 117–132, 141–46. Accordingly, appellant has not demonstrated he is entitled to relief.

Appellant's next two issues focus on letters he allegedly wrote to Marc Draper while in prison, in an effort to convince Draper to lie at trial. Appellant argues these letters were improperly admitted into evidence at trial because they contained prejudicial references to drug activity and to appellant's incarceration. He further argues the trial court should have granted a mistrial based upon the prosecutor's questions to the handwriting expert who identified the letters as having been written by appellant.

With respect to appellant's argument that the letters contained prejudicial references to prior bad acts, it was made clear to the jury that the references to drug activity were

merely part of the "story" concocted by appellant in order to disassociate himself from the murder; Marc Draper testified this story was clearly fiction. N.T. Trial, 1/22/86, at 732, 739, 748. Appellant's prison number and address were not redacted from the letters, but the trial court ruled there was no prejudice to appellant by leaving this information on the letters, since "the testimony clearly indicates that the [appellant] was in prison at the time; the inference being that he was awaiting trial on this case...." *Id.*, at 756–57. Appellant's argument that the address revealed he was in state prison instead of county jail, and thus was serving time for a prior murder, is baseless. There was no evidence presented concerning appellant's prior conviction, and the address on the letters did not name the correctional facility or indicate it was a state prison; therefore, appellant's contention that the jury drew this inference is meritless.

██ Appellant argues the prosecutor's questions to the handwriting expert prejudiced him by suggesting he had tried to disguise his handwriting when he provided samples to the expert. The prosecutor's questions were asked in response to the expert's description of how he is able to detect attempts to alter or disguise one's handwriting; when the prosecutor asked if the expert could ascertain whether appellant had attempted to disguise his writing, defense counsel objected and the trial court sustained the objection. The expert never answered the prosecutor's questions, and the jury was later instructed counsel's questions do not constitute evidence. N.T. Trial, 2/3/86, at 1790. *See Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221, 231 (1995) (it is well established that attorney's questions and statements are not evidence; juries are presumed to follow trial court's instructions). Accordingly, we perceive no prejudice to appellant.

██ Appellant's next three issues challenge the propriety of statements made by the prosecutor during the guilt phase. Appellant is entitled to a new trial on the basis of prosecutorial misconduct only where the unavoidable effect of the prosecutor's comments was to prejudice the jurors, form-

ing in their minds a fixed bias and hostility toward appellant, such that they were incapable of weighing the evidence objectively and rendering a true verdict. *Id.*, at 231. The prosecutor's comments cannot be viewed in isolation, but must be considered in the context in which they were made. *Commonwealth v. Carpenter*, 533 Pa. 40, 617 A.2d 1263, 1267 (1992).

■ On redirect examination of appellant, defense counsel asked whether he was eligible to return to college that fall, and if he had been planning to return. The prosecutor, knowing this line of questioning would open the door to character evidence, which would permit her to rebut this testimony with evidence of appellant's prior convictions, stated, "Objection, your honor. You know, if we may see you at sidebar, I think counsel is opening up an area that he, indeed, will regret." N.T. Trial, 1/30/86, at 1392. Appellant argues this remark prejudiced him because the jurors could have inferred there was other damaging evidence against him which they were not allowed to consider. The trial court, however, after overruling the prosecutor's objection and admonishing her not to "characterize anything about what the defense is doing," *id.*, immediately reminded the jurors the remarks of counsel were not evidence and instructed them to disregard the remark. *Id.*, at 1397. Since the jury is presumed to have followed the trial court's instructions, *LaCava*, at 231, appellant has not demonstrated counsel's remark prejudiced him.

■ Appellant next claims the prosecutor impermissibly commented on his failure to call certain witnesses. During closing, the prosecutor stated:

> Now, ladies and gentlemen, this case is not a case of [trial counsel] against the Commonwealth. Bear in mind that the defendant's resources do not rely exclusively on his attorney. *The defendant's case is the defendant's case, and whatever the defendant has or knows about this event, and if it were truthful, he has his opportunity, through his attorney, to bring in witnesses, to subpoena witnesses, to do*

what needs to be done on cross examination to bring out that truth.

N.T. Trial, 2/3/86, at 1660–61 (emphasis added).

 A prosecutor may respond to defense arguments and is free to present her case with logical force and vigor. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 240 (1999). The prosecutor's statements, viewed in the context in which they were made, were proper response to defense counsel's assertion in his closing argument that the defense does not have the "tremendous resources" the prosecution does:

> Generally, I would come before you and say what Terrence Williams has in his defense is [trial counsel]. The Commonwealth, as is their burden, has a tremendous amount of resources that they have available to it in order to build that case. Terrence Williams does not have access. I do not have access to those resource[s]. . . .

*Id.*, at 1627–28. The prosecutor's comments were fair response, and appellant's claim fails.

 Appellant next claims the prosecutor, during closing, impermissibly expressed her personal opinion concerning the credibility of his testimony:

> Mar[c] Draper's deal, as it were, is not one of the happiest moments of a prosecutor. Prosecutors don't, generally speaking, like to make deals with murderers; however, I think that a distinction can be made between two persons who commit the same atrocious act, one of whom does everything he can, after committing the act, to right his wrong. Obviously, he can't bring the victim back to life but he can do what is necessary to bring all responsible to justice in this case. Compare that with a person who commits atrocious, murderous, malicious acts and then spends the rest of his days lying, covering up, suborning perjury, trying to make things seem as they're not. *I think a distinction can be made in such a case.*

*Id.*, at 1695 (emphasis added). Viewed in context, these statements were not an opinion concerning appellant's credi-

bility; the prosecutor was contrasting the evidence of the Commonwealth's witness, Marc Draper, with that of appellant. Throughout trial, and during closing argument, defense counsel had attacked Draper's credibility; therefore, the prosecutor's comments were fair response. *See Commonwealth v. Miller*, 572 Pa. 623, 819 A.2d 504, 516 (2002) (as long as prosecutor does not assert personal opinions, she may comment on witness's credibility, especially when witness's credibility has previously been attacked by defense). Further, the prosecutor was summarizing appellant's actions after the murder; evidence of appellant's attempts to escape responsibility had been presented at trial. The prosecutor's use of the phrase "I think," viewed in context, does not transform her comparison of appellant and Draper into personal opinion. Therefore, appellant's argument is baseless.

Finally, regarding the guilt phase, appellant claims the jury instruction regarding Draper's liability as an accomplice violated appellant's due process rights because it did not incorporate appellant's alibi defense, thus implying he had admitted complicity in the murder. In reviewing an allegation of an incorrect jury instruction, the charge must be viewed as a whole. *Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268, 276 (1996). Jury instructions will be upheld if they adequately and accurately reflect the law and are sufficient to guide the jury properly in its deliberations. *Commonwealth v. Thompson*, 543 Pa. 634, 674 A.2d 217, 219 (1996). Here, the trial court instructed the jury:

> [W]hen a Commonwealth witness was so involved in the crime charged that he was an accomplice, his testimony has to be judged by certain precautionary rules.
>
> * * *
>
> In view of the evidence of Marc Draper's criminal involvement, you must regard him as an accomplice in the crimes charged and apply the special rules to his testimony. These are the special rules that apply in accomplice testimony: First, you should view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source....

N.T. Trial, 2/3/86, at 1773–74. Viewed in its entirety, the instruction adequately and accurately conveyed to the jury it should view Draper's testimony as coming from a corrupt source; it did not, as appellant contends, imply that because Draper was considered an accomplice, so was appellant. Furthermore, the jury had just been instructed regarding appellant's alibi defense: "The defendant's evidence that he was not present, either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt in your mind." *Id.*, at 1772. Accordingly, appellant's claim is meritless.

■■■■ With respect to the penalty phase, appellant first argues trial counsel was ineffective for failing to investigate and present psychiatric mitigating evidence. Specifically, appellant contends counsel relied only upon appellant's unstable mother to suggest potential mitigation witnesses, and counsel never investigated appellant's records for mental health mitigation evidence. Appellant claims, had trial counsel properly investigated, he would have discovered numerous lay witnesses who would have testified concerning appellant's abusive upbringing and dysfunctional family history; he further claims counsel should have utilized the 1985 presentence psychiatric evaluation of Dr. Edwin Camiel, appellant's prison health records, and transcripts from appellant's previous murder trial. Based on these sources, appellant contends, trial counsel would have learned "[a]ppellant's adult mental illness (*e.g.,* his psychosis, anxiety, delusions, paranoia and schizophrenic condition) all resulted from his [post traumatic stress disorder], which itself resulted from his abusive upbringing." Appellant's Brief, at 29.

"[T]his Court has declined to find counsel ineffective for failing to proffer testimony from a mental health professional to establish a mitigating circumstance where there is no showing that such testimony ... would have been beneficial in terms of altering the outcome of the penalty phase hearing." *Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 238 (1998). Appellant has not met this heavy burden.

At the PCRA hearing, appellant presented three mental health experts who testified that, had they seen Dr. Camiel's 1985 evaluation, they would have conducted further investigation concerning appellant's mental health. It is unclear, however, what beneficial information concerning any mental impairment at the time of the murder would have surfaced, given the evaluation's statement that appellant "denied any past psychiatric history." Report of Edwin P. Camiel, M.D., 2/27/85, at 2. While acknowledging appellant's very apparent mental agitation and expressing a concern that appellant was developing a psychotic disorder necessitating treatment, the evaluation clearly notes, "[t]his is the first evidence of psychiatric illness in this Defendant. . . ." *Id.,* at 3. Thus, based on the information in the evaluation, appellant's alleged mental illness surfaced after his incarceration; the evaluation gives no indication of any mental impairment at the time of the murder. Accordingly, trial counsel was not ineffective for failing to rely on this report.

The three mental health experts also testified that, at the time of the murder, appellant was acting under extreme mental disturbance and his capacity to appreciate the criminality of his conduct or to conform it to the requirements of the law was substantially impaired. *See* N.T. PCRA Hearing, 4/8/98, at 106; 4/9/98, at 375, 425; 4/13/98, at 551, 560. However, the PCRA court, weighing this testimony in context of the entire proceeding, along with the record evidence before it, concluded it was outweighed by testimony from these same experts that appellant "directed his hurt onto other people and that he was likely to respond to stressful situations in a manner without regard to the consequences." PCRA Court Opinion, 1/13/99, at 14. The PCRA court further noted the manner in which appellant planned and carried out the killing, as well as his subsequent attempts to cover up the murder by burning the body. *Id.,* at 15. Accordingly, we perceive no abuse of discretion by the PCRA court in weighing the evidence, and we will not disturb the court's determination. *See Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 93–94 (1998) (this Court is bound by PCRA court's credibility

determinations where there is record support for those deter-
minations).

At the PCRA hearing, appellant also presented the
testimony of several friends and family members concerning
his abusive childhood, claiming counsel should have called
these witnesses during the penalty phase. It does appear
from the record of the penalty proceedings that the three
mitigation witnesses counsel presented were not compelling; [11]
however, counsel testified at the PCRA hearing it was his
impression the mitigation witnesses utilized in appellant's first
murder trial were not willing to cooperate as witnesses at this,
his second. *See* N.T. PCRA Hearing, 4/17/98, at 767, 771–72.
Counsel also testified, had he reviewed the presentence re-
ports from appellant's prior trials, he would not have consid-
ered the issues of family dysfunction; rather, his tactic was to
present appellant as a promising athlete, a well-liked and
outgoing young man, for whom these charges were an extreme
aberration. *Id.*, at 765. Counsel further testified that to-
wards the end of the guilt phase, he became concerned
because "I had asked Mr. Williams for cooperation that [sic] I
wasn't getting it." *Id.*, at 791. Based upon this testimony,
the PCRA court concluded appellant had not met his burden
of demonstrating, had counsel presented such evidence during
the penalty phase, there was a reasonable probability appel-
lant would have received a life sentence. We will not disturb
the PCRA court's credibility determination, and find no abuse
of discretion by the court in this instance. Accordingly,
appellant is not entitled relief on this claim.[12]

11. The witnesses were: appellant's mother, who testified concerning
appellant's athletic accomplishments and only mentioned appellant's
abusive upbringing briefly during cross-examination by the prosecutor;
appellant's girlfriend, who testified appellant was a good father to their
infant daughter and a sweet, honest person; and appellant's cousin,
who gave a rambling narrative, peppered with Biblical references,
about appellant being pressured by his teammates and getting into
fights.

12. In his reply brief, appellant points to *Williams v. Taylor*, 529 U.S.
362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), in which the United
States Supreme Court found counsel ineffective for failing to conduct
sufficient investigation of potential mitigating circumstances. Appel-

██ The next three issues concern the jury's finding appellant had a "significant history of violent felonies." 42 Pa.C.S. § 9711(d)(9). Appellant argues this aggravating circumstance is unconstitutionally vague on its face; he further contends the prior convictions on which it was based in his case were constitutionally infirm, and that the prosecutor presented false evidence concerning the facts of one of these convictions.

This Court has repeatedly rejected the argument that § 9711(d)(9) is unconstitutionally vague. *See Commonwealth v. Hill*, 542 Pa. 291, 666 A.2d 642 (1995); *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 (1994); *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689 (1986); *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985); *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984). Appellant presents no compelling reason for us to overturn this line of cases.[13]

██ The prior convictions used to support this aggravating circumstance were appellant's 1982 conviction for robbery and burglary, and his 1984 murder conviction. Appellant now

lant contends counsel's preparation in that case was more extensive than that of appellant's counsel, and the high Court still found counsel's performance deficient and prejudicial. However, the mitigating evidence of the defendant's nightmarish childhood in *Williams* was significantly different than that in appellant's case; the neglect and abuse in *Williams* was so extensive as to require the parents' incarceration. Furthermore, as the PCRA court and this Court have concluded, appellant has not met his burden of demonstrating there was reasonable probability the presentation of this evidence would have resulted in a life sentence instead of the death penalty. Appellant had a significant history of violent felony convictions; this was not his first murder conviction. Therefore, we reject appellant's attempt to analogize *Williams*. *See Commonwealth v. Williams*, J-204-2002 (mitigation evidence would not have had reasonable probability of changing outcome of proceedings, where records were replete with indications of appellant's violent and aggressive history).

13. Appellant attempts to distinguish *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), on which this line of cases relied; he argues *Proffitt* involved a challenge to an allegedly vague *mitigating* circumstance. However, as this Court noted, *Proffitt* drew no such distinction: "a jury's evaluation of the *aggravating and mitigating* circumstances, as enumerated, requires no more line drawing than is commonly required of a factfinder in any law suit." *Beasley*, at 737 (citing *Proffitt*, at 257, 96 S.Ct. 2960) (emphasis added).

claims these convictions were obtained in violation of his constitutional rights, and recycles some of his arguments made on direct appeal of these convictions to the Superior Court. However, these convictions were affirmed on direct appeal, and have long since become final. *See, e.g., Commonwealth v. Williams,* No. 03247 Philadelphia 1996, unpublished memorandum (Pa.Super. filed November 12, 1997). Thus, appellant's claim fails.

Furthermore, there is no support for appellant's claim that the prosecutor introduced false testimony concerning the underlying circumstances of the 1982 robbery and burglary. Specifically, appellant claims testimony concerning his holding a rifle to the neck of one victim and firing it over the head of the other victim was false because his demurrer to the weapon possession charge in that case was sustained. However, the record belies appellant's claim; the Superior Court's opinion on direct appeal reveals appellant brandished the rifle and fired it to intimidate the victims. *Id.,* at 3. Accordingly, appellant's claim is baseless.[14]

██ Appellant next claims the prosecutor improperly injected her personal opinion regarding the propriety of the death penalty into her closing argument during the penalty phase: "He terrorized, he robbed, he blundered, and he killed, and he continued to kill, and I tell you, ladies and gentlemen, that *if the death penalty doesn't apply to Terrance Williams, I don't know who it would apply to.*" N.T. Trial, 2/3/86, at 1876 (emphasis added).

 "During the sentencing phase of a capital case, a prosecutor must be afforded reasonable latitude in arguing [her] position to the jury and [she] may employ oratorical flair in arguing in favor of the death penalty." *Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 231–32 (2003) (internal citations omitted). Furthermore, "[a]t the penalty phase, the prosecutor has more latitude in presenting argument since the

14. Further, even if this aggravating circumstance was not applicable to appellant, the jury found another aggravating circumstance, § 9711(d)(6), existed, and no mitigating circumstances were found; the penalty would still have been death. *See* n. 8, *supra.*

presumption of innocence is no longer applicable." *Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 790 (1998).

Viewed in the context of the entire statement, the underlined comment of which appellant complains was nothing more than oratorical flair; the prosecutor summarized the evidence of appellant's criminal acts and argued, from that evidence, that the jury should impose a death sentence. Accordingly, this claim is meritless.

Appellant next argues he was entitled to have the jury instructed that "life" means "life without parole," because Draper's testimony left the jury with the impression a prisoner serving a life sentence would be eligible for parole.[15] Draper testified that when he first agreed to plead guilty in exchange for a life sentence, he was under the impression he would later be eligible for parole if he testified against appellant. N.T. Trial, 1/23/86, at 784–86. Appellant contends "[t]his incorrect information was never corrected by the prosecutor, defense counsel or the court . . . ," Appellant's Brief, at 76; however, the record belies this claim. During the same line of questioning which revealed Draper's former misconception about his plea agreement, defense counsel queried, "But it is your understanding now that that's not part of your agreement?" and Draper responded, "Yes." N.T. Trial, 1/23/86, at 786–87. Defense counsel also stated during closing, while arguing for the imposition of a life sentence, that appellant would "never enjoy the fruits of being a father, because he will spend his entire life in jail." N.T. Trial, 2/3/86, at 1880. Furthermore, it was clear from Draper's testimony that he believed he might later be paroled because of his testimony against appellant; there was no similar cooperation with the

---

15. Although such instruction is mandated in cases where the defendant's future dangerousness is at issue and defense counsel requests such instruction, *see Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995), *Simmons* was decided four years after appellant's judgment of sentence became final and thus is inapplicable to his case. Furthermore, appellant's future dangerousness was not at issue.

Commonwealth by appellant. Therefore, appellant's claim is meritless.

Appellant next claims his death sentence was the product of improper racial discrimination, citing a 1998 study conducted by Professors David Baldus and George Woodworth which concluded the odds of an African–American defendant being sentenced to death in Philadelphia are more than four times greater than for other defendants. *See* David C. Baldus, *et al., Racial Discrimination and the Death Penalty in the Post–Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia,* 83 Cornell L. Rev. 1638 (1998). Appellant also relies on the "McMahon tape," a 1987 videotape in which a Philadelphia assistant district attorney, Jack McMahon, revealed a policy of racial discrimination in jury selection by members of that office. *See Commonwealth v. Wharton,* 571 Pa. 85, 811 A.2d 978 (2002).

This Court has repeatedly rejected similar arguments on the basis that the mere existence of the tape does not demonstrate prejudice in a particular case. *Rollins,* at 443 n. 10; *see also Commonwealth v. Marshall,* 570 Pa. 545, 810 A.2d 1211, 1228–29 (2002); *Commonwealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 588–89 (2000). Similarly, we have rejected speculative arguments based on the study. *See Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 698 (2003) (citing *Marshall, supra; Lark, supra*). Although appellant discusses the Baldus study and the McMahon tape at length, he fails to demonstrate how these alleged discriminatory trends affected the jury selection in his case. He attempts to provide statistical evidence of the prosecutor's routine practice of striking African–Americans from jury panels, but, given the actual jury composition in this case was 41.6% African–American, he fails to show discrimination by the prosecutor. As appellant does not provide a link between the study/tape and the facts and circumstances of his particular case, his claim does not warrant relief.

Appellant next challenges this Court's proportionality review of his sentence on direct appeal, essentially claiming the

data compiled by the Administrative Office of Pennsylvania Courts is unreliable and flawed. A similar argument was addressed in *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426, 440–41 (1997) (finding nothing arbitrary or capricious in proportionality review scheme), and rejected; appellant presents no compelling reason for us to revisit this issue. Furthermore, appellant fails to demonstrate any specific error resulting from this Court's application of the data to his case. Accordingly, this claim is meritless.

 Finally, appellant claims the cumulative effect of all the alleged errors entitles him to relief. However, as this Court has repeatedly stated, "no number of *failed* claims may collectively attain merit if they could not do so individually." *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 722 (1992) (emphasis in original). Accordingly, we affirm the PCRA court's denial of relief; the Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor, pursuant to 42 Pa.C.S. § 9711(i).

Order affirmed. Jurisdiction relinquished.

Justice BAER files a concurring opinion.

Justice NIGRO files a dissenting opinion.

Justice SAYLOR files a dissenting opinion.

Justice BAER concurring.

I write separately only to note my view that jury instructions, such as those given here, which mirror the language of Section 9711(c)(1)(iv) of the Pennsylvania Death Penalty Statute, 42 Pa.C.S. § 9711(c)(1)(iv), impermissibly infer a requirement that any mitigating circumstance must be found unanimously by the jury in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).[1]

1. Section 9711(c)(1)(iv) provides:
 [T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating

Nevertheless, I join the majority opinion in all respects for several reasons. First, the majority properly disposes of the assertion on a waiver theory, noting that such claim was previously litigated on direct appeal. Second, the majority notes the United States Supreme Court's recent ruling in *Beard v. Banks*, No. 02–1603, 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004), makes it clear that *Mills* does not apply retroactively to cases, such as this, that were decided prior to its issuance.[2] Finally, the majority notes that, on direct appeal, this Court, in upholding the instruction at issue, relied on our decision in *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27, 31 (1989), *cert. denied*, 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990), holding that the language of the death penalty statute does not "state or infer a requirement that any given mitigating circumstance must be unanimously recognized before it can be weighed against aggravating circumstances in reaching a verdict." Thus, based upon principles of *stare decisis*, I am bound to follow our prior precedent in this regard.

Justice NIGRO dissenting.

I dissent, as I agree with Justice Saylor that Appellant has demonstrated that his trial counsel was ineffective for failing to adequately investigate and present evidence of mitigation, including evidence of Appellant's mental health and abusive childhood, at his penalty phase hearing. Appellant, however, has presented only a boilerplate allegation that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness in this regard. Thus, as the majority notes, Appellant has not preserved an ineffectiveness claim arising from appellate counsel's deficient performance and such a claim is the only one on which relief may be granted. *See* Op. at 68–70, 863 A.2d at 512. Given these circumstances, I would, consistent with this Court's recent decision in *Commonwealth*

circumstances. The verdict must be a sentence of life imprisonment in all other cases

**2.** Appellant's trial occurred in 1986, two years prior to the Supreme Court's decision in *Mills*.

*v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), remand the matter to provide Appellant with the opportunity to develop his claim as it relates to appellate counsel's performance.

Justice SAYLOR dissenting.

I respectfully differ with the majority's reasoning in several material respects. Furthermore, I would award a new penalty hearing relative to Appellant's claim of ineffective assistance of counsel for failing to adequately investigate and develop mitigation relevant to the capital sentencing determination.

First, I disagree with the majority's assignment to Appellant's claim of racial discrimination in jury selection of a deficiency, based on the requirements established in *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176 (1993), which interposes as a prerequisite to assertion of a violation under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the obligation to present a record identifying the race of the venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the jury finally selected. *See id.* at 246–47, 627 A.2d at 1182.[1] Although those seeking relief from criminal convictions have frequently had difficulty meeting these requirements, perhaps because preservation is frequently dependent on the thoroughness of trial counsel, in this particular case the trial court maintained its own, independent record concerning each of these factors, which it read into the record of the postconviction proceedings.[2] Therefore, Appellant's assertion that

1. As the Court has recently observed, the United States Court of Appeals for the Third Circuit has deemed the *Spence* requirements to be an unreasonable application of federal law, at least as applied in some circumstances. *See Commonwealth v. Uderra,* 580 Pa. 492, 508–12, 862 A.2d 74, 84–86, 2004 WL 2363725, at *6–7 (2004) (citing *Holloway v. Horn, Holloway v. Horn,* 355 F.3d 707, 728–29 (3d Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 410, 160 L.Ed.2d 352 (2004)).

2. The record thus reflects that the total composition of the jury panel was 111 jurors, 68 of whom were Caucasian and 43 of whom were African American. The composition of the jury was seven Caucasian members, five African Americans. Total peremptory challenges assert-

the Commonwealth used 14 of 16 peremptory challenges to strike African Americans is not a bald one, as the majority indicates, *see* Majority Opinion, at 73–75, 863 A.2d at 515, but is an undisputed matter of record in the case as developed and determined by the PCRA/trial judge. For the same reason, all of the other required information is squarely before the Court. *See supra* note 2.

At least in the context of an contemporaneous challenge to an in-progress jury selection proceeding, it is my position that a prosecutor's direction of 14 of 16 peremptory challenges (or almost 90 percent of the total strikes employed) toward African American venirepersons, out of a jury pool comprised of less than 40 percent persons having such racial heritage, should be deemed sufficient to make out a *prima facie* case under *Batson,* thus implicating an explanation of the race-neutral bases for the challenges (if any) from the prosecutor. *See generally Batson,* 476 U.S. at 96, 106 S.Ct. at 1723 (explaining that a criminal defendant is entitled to rely upon the fact that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' "); *id.* at 97, 106 S.Ct. at 1723 (observing that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination"); *United States v. Alvarado,* 923 F.2d 253, 255–56 (2d Cir.1991) (concluding that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*"); *Commonwealth v. Jackson,* 386 Pa.Super. 29, 48 n. 5, 49, 562 A.2d 338, 347 n. 5, 348 (1989) (*en banc*). I concur in the majority's decision to affirm the denial of relief from the conviction in this case, however, as *Batson's* burden-shifting scheme does not readily comport with the post-conviction review process when no contemporaneous objections were asserted at *voir dire, see Uderra,* 580 Pa. at 510–12, 862 A.2d at 85–86; and, in any

ed were 35, 16 of which were utilized by the Commonwealth to challenge two Caucasian and 14 African American venirepersons, and 19 of which were utilized by the defense to challenge 16 Caucasian venirepersons and three African Americans. *See* N.T., April 16, 1998, at 643.

event, the prosecutor provided race-neutral explanations in the PCRA proceedings to the degree that her memory permitted, as well as her categorical denial of engagement in the pernicious practice of discrimination. *See* N.T., April 16, 1998, at 648–732. Although it would have been preferable for the PCRA court to render more specific factual findings and conclusions of law on the *Batson* claim, particularly given the pattern emerging out of the strikes, it is apparent that the court acted in its capacity as fact finder to accept the prosecutor's testimony on the ultimate issue concerning her motivations.

A second area of difference involves the review of Appellant's claim that the aggravating factor in Section 9711(d)(6) of the death penalty statute (killing committed during the perpetration of a felony) was improperly applied to him because he may have been convicted on the basis of the trial court's instruction as to accomplice liability rather than as the actual killer. *See* Majority Opinion, *op.* at 75–76, 863 A.2d at 514–16. What is most troubling about this issue is that the Court's prior treatment of it on direct appeal, presently relied upon by the majority as a basis for denying further review, is glaringly superficial and incorrect. In this regard, the Court reasoned that Appellant could not have been convicted by the jury as an accomplice, because a first-degree murder conviction necessarily equates with a finding that the defendant struck the fatal blow. *See Commonwealth v. Williams,* 524 Pa. 218, 233–34, 570 A.2d 75, 83 (1990) (indicating that "[t]his argument [i.e., that Appellant might have been convicted as an accomplice], when raised in the context of the penalty stage, does not even reach the level of speciousness; it is simply ludicrous. The very same jury, less than twenty-four hours before, had just convicted appellant of first degree murder."). The Court so reasoned despite the fact that the trial court had issued a general accomplice liability instruction at the guilt phase of Appellant's trial,[3] and with no accounting for the established

3. *See* N.T., February 3, 1986, at 1750 ("It will be your duty in this case to determine whether Amos Norwood died as a result of injuries inflicted upon him by this defendant or whether this defendant was an accomplice of the person who actually inflicted the injuries, and if so, whether such killing amounted to murder of the first degree[.]"), *id.* at

law that a defendant can be convicted of first-degree murder based on an accomplice liability theory without the necessity of his direct participation in the actual killing. *See, e.g., Commonwealth v. Smith,* 480 Pa. 524, 528–29, 391 A.2d 1009, 1011 (1978).

Moreover, as the majority notes, the Court has separately determined that the in-perpetration-of-a-felony aggravator does not apply to one who is convicted of first-degree murder merely as an accomplice. *See Commonwealth v. Lassiter,* 554 Pa. 586, 595, 722 A.2d 657, 662 (1998) ("[Section] 9711(d)(6) may not be applied to an accomplice who did not 'commit' the killing in the sense of bringing it to completion or finishing it.").[4] Appellant, however, was deprived of the benefit of a determination in this regard in his direct appeal by this Court's failure to cognize rudimentary aspects of the law of accomplice liability and its potential role in the jurors' determination of Appellant's guilt of first-degree. murder. In the face of appellate court error that is so apparent, I have substantial difficulty with application of the bar of previous litigation, as I believe that such application is in tension with the courts' constitutional obligation to assure that the writ of

1768–70 (general accomplice liability instruction). The accomplice liability charge presumably was issued at the Commonwealth's instance precisely to account for the possibility that one or more jurors might give some credence to the defense evidence to the effect that Appellant left the company of the victim at a time when he was unharmed but under restraint by Michael Hopkins and Marc Draper. *See, e.g.,* N.T., January 27, 1986, at 1182–84.

4. Although *Lassiter* is a plurality opinion, six Justices agreed that a prosecution for murder based on accomplice liability will not support the use of the aggravating circumstance set forth in Section 9711(d)(6). *See Lassiter,* 554 Pa. at 595, 722 A.2d at 661; *id.* at 599–600, 722 A.2d at 664 (Saylor, J., dissenting) ("I agree with the majority that a prosecution for murder based on accomplice liability will not support the use of the aggravating circumstance set forth in Section 9711(d)(6) of the Judicial Code."). Additionally, I do not believe that there is any retroactivity concern regarding *Lassiter,* since it merely represents a plain-text reading of a substantive provision of statutory law that was in place at the time of Appellant's trial. *See Lassiter,* 554 Pa. at 593, 722 A.2d at 660–61 (stating that "we believe that this matter can and must be resolved by reference to the text and plain meaning of the statute itself").

habeas corpus remains unsuspended. *See* Pa. Const. art. I, § 14.[5]

Regarding the ineffectiveness claim relative to counsel's failure to investigate and adduce adequate mitigation in the penalty phase, the governing standards are well established. In general, capital defense counsel are obliged to conduct reasonable investigations or reach reasonable decisions that make a particular investigation unnecessary. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Commonwealth v. Basemore,* 560 Pa. 258, 289, 744 A.2d 717, 735 (2000). In the context of the penalty phase of a capital case, counsel has a duty to thoroughly investigate a defendant's background, *see Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000), including the obligation to "discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " *Wiggins v. Smith,* 539 U.S. 510, 525, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003) (quoting ABA GUIDELINES FOR THE APPOINT-MENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES, 11.4.1(C), p. 93 (1989)).[6] The reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation, *see id.* at 526–27, 123 S.Ct. at 2538; however, strategic decisions made on the basis of an inadequate investigation can be deemed reasonable only to the extent that reasonable professional judgment supported the

---

5. This issue is also more significant to my analysis than it is to the majority's, given my position, developed below, concerning counsel's stewardship in connection with the jury's finding of no mitigation.

6. I make substantial reference herein to the ABA Guidelines, realizing that this Court has not endorsed or adopted them on a wholesale basis. The United States Supreme Court, however, has referenced these Guidelines in terms of articulating prevailing norms for effective counsel. *See, e.g., Wiggins,* 539 U.S. at 524–25, 123 S.Ct. at 2536–37. In any event, in my view, the drafters' claim that the Guidelines "embody the current consensus about what is required to provide effective defense representation in capital cases," ABA GUIDELINES FOR THE APPOINT-MENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES 1.1, commentary (rev. ed. Feb. 2004) [hereinafter, ABA GUIDELINES], is not an exaggerated one.

limitations on the investigation. *See id.* at 529, 123 S.Ct. at 2539. Finally, in terms of the reasonable basis and prejudice prongs of the ineffectiveness inquiry, relief is available only in cases in which it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. *See Commonwealth v. Williams,* 557 Pa. 207, 248, 732 A.2d 1167, 1189 (1999).

Here, the record shows fairly plainly that counsel was remiss in his penalty-phase investigation and preparation. Although it was his first capital penalty proceeding, *see* N.T., April 24, 1987, at 15, counsel apparently failed to meet personally with Appellant until one week prior to trial. *See* N.T., January 6, 1986, at 25, 31–33; N.T., April 16, 1998, at 755.[7] Furthermore, it is undeniable that competent counsel would have reviewed records from Appellant's other criminal proceedings (particularly since they were in issue in the case in terms of the Commonwealth's assertion of the significant-history-of-violent-felony-convictions aggravator). *See generally* ABA Guidelines 1.1, commentary (stating that "if the defendant has any prior criminal history, . . . [d]efense counsel accordingly must comprehensively investigate"); *id.* 10.7, commentary (same). Thus, counsel would have become aware of the prior, pre-sentence investigation in Appellant's criminal

---

7. Counsel's primary excuse in this regard centered on his practice of using associates. *See, e.g.,* N.T., January 6, 1986, at 22. There is little in the record, however, to suggest that there was actual, meaningful pre-trial preparation undertaken by Appellant's associates. Moreover, I have difficulty with the proposition that lead capital counsel can expect to develop the kind of trust relationship with his client that is essential to effective representation without meeting his client substantially in advance of trial. The ABA Guidelines' commentary explains:

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. Client contact must be ongoing, and include sufficient time spent at the prison to develop a rapport between attorney and client. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial. . . . Even if counsel manages to ask the right questions, a client will not—with good reason—trust a lawyer who visits only a few times before trial. . . .
ABA Guidelines, 11.4.1(C), commentary.

record indicating that he had a recent psychotic episode and was a candidate for psychiatric evaluation and treatment. *See* N.T., April 16, 1998, at 763, Ex. C–2; *see also* N.T., April 8, 1998, at 81. This, in turn, would trigger an obligation on counsel's part to undertake a further investigation into his client's mental health. According to expert testimony adduced by Appellant at the PCRA hearing that was not specifically rejected by the PCRA court (and common sense), a capital defendant's history of having had a psychotic episode absolutely requires further investigation.[8] Instead, what occurred is that counsel apparently, and inappropriately, relied upon his own assessment of Appellant to discount involving a mental health professional, N.T., Jul. 1, 1987, at 60–61.[9] Notably, as well, since counsel first observed Appellant immediately before trial, the opportunity to develop mental health evidence upon his observations was severely constrained.[10]

8. *See* N.T., April 8, 1998, at 87–88 (testimony from a psychiatrist that a psychotic episode "absolutely" would have required further investigation); N.T., April 9, 1998, at 373 (psychologist describing the event as a "red flag" and "alerting signal"); N.T., April 13, 1998, at 549 (psychiatrist indicating that the report showed that "something [was] grossly wrong"); *cf. Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 72–73 (2003) (finding that an ineffectiveness claim had arguable merit where trial counsel failed to investigate potential psychiatric evidence). *See generally* ABA GUIDELINES 4.1, commentary (observing that "mental health issues are so ubiquitous in capital representation that the provision of resources in that area should be routine"); *id.* 4.1, commentary ("In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row."); *id.* (observing that "the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase[;] ... [c]ounsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination.").

9. *Cf. Austin v. Bell*, 126 F.3d 843, 849 (6th Cir.1997) (finding deficient stewardship arising from capital trial counsel's failure to investigate and present mitigating evidence at the penalty phase "because he did not think that it would do any good"); *accord* ABA GUILDELINES, 4.1 ("Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance." (footnote omitted)).

10. Trial counsel also did not seem to be versed in the use of psychiatric evidence as mitigation, as reflected in the following interchange from the PCRA hearing:

Evidence adduced at Appellant's post-conviction hearing indicated that, had counsel undertaken such an investigation by exploring Appellant's life history and having Appellant examined by a defense expert from the mental health field, he would have uncovered a history of emotional and physical trauma, and chronic and major psychiatric illness in place as of the time of Appellant's offenses. The evidence developed at hearing, if believed (and the PCRA court did not render any findings rejecting it on credibility grounds), revealed that Appellant was reared in a severely dysfunctional family, with members' relationships characterized by neglect, abandonment,[11] and routine violence that was often vicious,[12] and

Q: Do you know what it means to have a paranoid delusional system?
A: Uhm, today I can't give you a working definition, no.
Q: Do you know what psychosis is?
A: Today vis-à-vis this case, no.
Q: I'm sorry.
A: No.

\* \* \*

Q: Do you know the interaction between impulsivity and post-traumatic stress disorder?
[PROSECUTOR]: Objection.
Q: (continued) If any.
THE COURT: I'm going to sustain it. That's enough. That's enough.
[THE COURT]: Your basic position is, reading the report, without knowing what all the things are, it was your strategy then not to proceed with psychiatric testimony; is that correct?
A: That's absolutely correct.
Q: Would your strategy be any different today?
A: No, not at all.
[PCRA counsel]: But you don't know what any of this means?
[THE COURT]: You can argue that.
N.T., April 13, 1998, at 801–02.

11. See, e.g., N.T., April 8, 1998, at 269–70 (testimony of Appellant's brother observing that, in interactions between Appellant and a stepfather, the stepfather "acted like [Appellant] wasn't there").

12. See, e.g., N.T., April 8, 1998, at 195 (testimony of Appellant's mother that she beat his head against a wall, "picked him up and threw him down the flight of steps and I beat him like Muhammad Ali"); id. at 196 ("I would beat [Appellant] very often ...."); id. at 197–200 (description of interspousal violence, including blackjacking witnessed by Appellant); id. at 216 (testimony of a school teacher concerning uncontrolled rages on the part of Appellant's mother and "huge explosions" between her and Appellant's stepfather); id. at 256 (testimony of

sometimes public. *See* N.T., April 9, 1998, at 497–98. The evidence also depicted Appellant's enlistment by his mother into the pattern of abuse. *See* N.T., April 9, 1998, at 302–03 (testimony of Appellant's sister describing incidents in which Appellant and his brother were told by the mother to tie the sister to the bed, in preparation for a beating). Furthermore, there was evidence that Appellant was subject to multiple sexual victimizations (including sodomy) during his childhood, in the local neighborhood and a youth placement facility, and at the hands of a teacher.[13] Additionally, it was developed that Appellant, as a child, engaged in acts of self-abuse and mutilation, characteristic of people in distress. *See, e.g.,* N.T., April 8–9, 1998, at 204, 332.

Post-conviction testimony was also adduced from expert witnesses from the mental health field to develop the effects of the sort of trauma described in the evidence on a child's mental and emotional development, in terms of its impact in generating humiliation, shame, depression, and feelings of helplessness, as well as impeding the development of a sense of self-worth, *see, e.g.,* N.T., April 8–9, 1998, at 48, 325, 327, 333–34; N.T., April 13, 1998, at 534; the fostering of repressed and overt anger, *see, e.g., id.* at 66, 97, 349, facilitation of aggressiveness as a behavior, *see, e.g., id.* at 49; and yielding the sorts of repressive, disassociative, and impulsive responses and behaviors that are prevalent among abused children. *See, e.g.,* N.T., April 9, 1998, at 388; N.T., April 13, 1998, at 532. *See generally* N.T., April 13, 1998, at 543

Appellant's older brother that the mother beat the children with "a belt, a board, a stick, a brick, a switch, whatever she got in her hand . . . ."); *id.* at 255–56 (testimony of the brother concerning his having assumed the role of abuser with respect to the younger children in the household); N.T., April 9, 1998, at 298 (testimony of Appellant's sister to beatings "with brooms, sticks, belts, pots and pans, knives, shoes, chairs"); *id.* at 298 (describing the intentional scalding of Appellant's sister by his mother); *id.* at 492–95 (testimony of a friend concerning the "raging" behavior of Appellant's stepfather, describing the violence as a "family ritual"); N.T., April 13, 1998, at 620–32 (testimony of a neighborhood resident and family friend concerning the family history of violence).

13. *See, e.g.,* N.T., April 8, 1998, at 193 (testimony of Appellant's mother describing his sodomization).

(testimony of Ralph Kauffman, M.D., describing the "whole fabric of abusive relationships that have these kind of power dynamics of abuser/abused"). The expert evidence also indicated the role of the abuse in Appellant's diagnosis as suffering from major mental health disorders as of the commission of the killing underlying his death sentence. *See, e.g.,* N.T., April 8, 1998, at 42–43, 106 (testimony of Dr. Kessel, *inter alia,* chronic post-traumatic stress disorder and major depression, Axis I diagnoses); N.T., April 9, 1998, at 373 (testimony of Dr. Patricia Fleming, a clinical psychologist experienced in working with abused children); N.T., April 13, 1998, at 520–21, 551 (Dr. Kauffman).[14]

It is my position that the mitigation evidence presented on post-conviction review represented a substantially better case in favor of imposition of a life sentence and against death than reliance solely on the athletic-achievement-and-community-participation approach that the majority attributes to trial counsel. This is particularly so, in my view, given trial counsel's sub-standard, single-paragraph argument to the jury on this latter score.[15] Moreover, to the extent that the jurors on their own might have been inclined to view the athletic-

---

14. Notably, the Commonwealth presented no contrary testimony from an expert witness examining Appellant for purposes of rebutting the case of psychiatric mitigation. *Compare Commonwealth v. Lopez,* 578 Pa. 545, 557–58, 854 A.2d 465, 472 (2004) (Saylor, J., concurring) (concurring in the denial of post-conviction relief in a case in which the Commonwealth presented testimony of an expert psychiatrist, credited by the PCRA court, to the effect that the appellant suffered from no mental health deficits).

15. Oddly, this was put to the jury, not for the reasons that the majority suggests (to show some other side to Appellant), but rather, as follows:

> [Appellant's] athletic ability, his physical ability will now work to his detriment. If you ever heard of a book, The Belly of the Beast, it vividly describes prison life. There is no impediment, because of his physical stature, to living all of the evils, all of the detriments, all of the brutalities that are associated with prison life. He will have them to the fullest.

N.T., February 3, 1986, at 1880–81. The entire penalty-phase closing argument for the defense consists of only four pages of transcript. *See id.* at 1877–81; *cf. Douglas v. Woodford,* 316 F.3d 1079, 1087–89 (9th Cir.2003) (finding counsel ineffective, *inter alia,* for failing to adequately present the material that he did have "to the jury in a sufficiently detailed and sympathetic manner").

achievement-and-community-participation evidence as mitigating, the Commonwealth's response could readily have been anticipated,[16] and blunted by the presentation of the fuller perspective concerning Appellant's life that trial counsel never uncovered.

I also believe that the PCRA court's approach in rejecting the ineffectiveness claims arising out of counsel's failure to investigate and present the life-history and mental-health mitigation evidence is a flawed one. The court offered two reasons for rejecting the life-history mitigation: first, that some evidence of the abuse of Appellant at the hands of his stepfather was actually put before the jury at the penalty phase of his trial, and second, that Appellant failed to cooperate in obtaining witnesses. Although the court is correct that testimony was in fact adduced at trial briefly describing abuse by the stepfather, the evidence was not developed by trial counsel for defense purposes. Rather, it was adduced by Commonwealth for its own purposes during its cross-examination of Appellant's mother, see N.T., Feb. 3, 1986, at 1856–57; moreover, trial counsel did not argue that it should be considered to be mitigating in his exceptionally brief penalty-phase summation. See N.T., Feb. 3, 1986, at 1877–81. Additionally, trial counsel had not offered (and was obviously unprepared to offer) expert testimony from a mental health professional to establish a concrete framework concerning why the evidence that was heard should be considered mitigating.

16. The district attorney argued:
> Now, I dare say, ladies and gentlemen ... that everyone was shocked and dismayed that their hero, their quarterback, their athletic star, was guilty of such a horrible crime ... the defendant presents an image of a person who had all kinds of advantages. Such a person would be able to essentially make the best possible life for himself and for the people that have loved him and cared for him. . . . He had a girlfriend and a child and friends and supportive teachers and people who I suggest to you looked up to him because he was gifted. He had the gift of an athletic ability that would have permitted him to do whatever he wanted with his life. He had the opportunity to not only finish high school but to go on to college. He could have made whatever he wanted out of his life but what did he do instead?
> N.T., Feb. 3, 1986, at 1874–76.

Regarding the PCRA court's indication that Appellant failed to cooperate with the production of witnesses, trial counsel's testimony was highly equivocal. Most times, counsel merely highlighted Appellant's expectation that counsel would defend the guilt-phase vigorously,[17] and denied having a specific recollection concerning discussions of mitigation.[18] Moreover, counsel substantially qualified his assertions of non-cooperation on Appellant's part, as follows:

Q: Did Mr. Williams or his mother in any way prevent you from interviewing either those witnesses or other mitigation witnesses?

A: Only to the extent that he had me focus on the guilt phase and that you have a certain amount of time. Remember what I said to you, I had negotiated to, where had he wanted it, he could have had a consecutive life sentence. That's not what he wanted. He wanted to try the case. Okay?

N.T., April 17, 1998, at 768. Since the evidence indicates that Appellant did not affirmatively impede counsel's investigation in the relevant regard, I fail to see that counsel's inability or

17. Contrary to counsel's frequent suggestions on the PCRA record, a capital defendant's insistence on defending against conviction is not an excuse to omit penalty-phase preparations. *Compare* N.T., April 17, 1998, at 760 (trial counsel's testimony that "[u]hm, I would just continue to urge you to what I—that [Appellant's] focus was that he was not guilty, uhm, and that was the general direction that we went in"); *id.* at 779 ("[Appellant] was very interested in being found not guilty. That was his—that was the focus ....."); *id.* at 771 ("See, I'm a very busy person."); *id.* at 760 ("I'm going to say this one more time. I could have saved this man's life. We had negotiated a plea to where he could have gotten a life sentence."), *with* ABA GUIDELINES 10.7 ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). Notably, in the face of such expressions by counsel at trial, the trial court reminded counsel of Appellant's constitutional right to be tried by a jury, and the continuing obligations of counsel to adequately prepare and perform. *See* N.T., January 6, 1986, at 19, 25.

18. N.T., April 17, 1998, at 752 ("I don't have a specific recollection of having an independent thought process relative to guilt or penalty."); *id.* at 756 ("if you ask me a question relative to when we discussed mitigation and things, I don't really have a recollection"); *id.* at 766 ("No, you asked me if I have a recollection of [my thought process], I don't.").

unwillingness to commit the time necessary to develop a defense as to all aspects of a capital case should be accepted as an excuse for his lack of preparation.[19] Similarly, Appellant's failure to identify and raise the strategy on his own, *see, e.g.,* N.T., April 17, 1998, at 765 (trial counsel's testimony, indicating that Appellant's history of abuse was "not something he particularly raised with me"),[20] can hardly be accepted as a means of avoiding the finding of ineffectiveness. *See Commonwealth v. Malloy,* 579 Pa. 425, 460–61, 856 A.2d 767,

**19.** Notably, the ABA Guidelines also add the following perspective concerning the sort of representation that was afforded here:

> Often, so-called "difficult clients" are the consequence of bad lawyering—either in the past or present.
>
> * * *
>
> Some clients will initially insist that they want to be executed—as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect the distorting effects of overwhelming feelings of guilt and dispair rather than a rational decision in favor of a state-assisted suicide.

ABA GUIDELINES 10.5, commentary; *cf.* ABA GUIDELINES 10.7A(2) ("The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."); *id.,* commentary ("Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case."); *accord Blanco v. Singletary,* 943 F.2d 1477, 1501–02 (11th Cir.1991) (finding trial counsel ineffective where "the ultimate decision that was reached not to call witnesses [in mitigation] was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto defendant's statements that he did not want any witnesses called").

**20.** The following interchange between post-conviction and trial counsel is also representative:

> Q: Did you explore or investigate whether there was any question of in Mr. Williams' background in regards to childhood abuse or family dysfunction?
>
> A: He never, ever discussed anything like that with me.
>
> Q: Did you ask?
>
> A: Did I ask?
>
> Q: Did you ask?
>
> A: I honestly don't recall, but I'm sure I would have had discussion, is there anything you want me to bring out?

N.T., April 13, 1998, at 761–62.

788 (2004) ("The onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit. Counsel's duty is to discover such evidence through his own efforts, including pointed questioning of his client.").

The PCRA court's opinion also does not diffuse the import of the mental health mitigation evidence. In this regard, the court's analysis primarily entailed identification of a few discrete weaknesses in facets of Appellant's expert testimony, but it failed to squarely confront the overall purport of the testimony. For example, while criticizing one expert for failing to render an ultimate conclusion concerning Appellant's ability to conform his conduct to the requirements of the law at the time of his offense, the PCRA court merely disregarded the extensive testimony of Appellant's primary expert witness, a forensic psychiatrist, to the effect that Appellant suffered from extreme mental or emotional disturbance at the time of his offense. *See, e.g.,* N.T., April 8, 1998, at 106. *See generally* 42 Pa.C.S. § 9711(e)(2) (indicating that mitigating circumstances shall include that "the defendant was under the influence of extreme mental or emotional disturbance"). Indeed, the PCRA court made no mention in its opinion of the testimony of the forensic psychiatrist, Dr. Julie Beth Kessel, or her conclusion implicating the mitigating circumstance at Section 9711(e)(2), which was never presented to Appellant's capital sentencing jury.

The PCRA court's position concerning mental health mitigation is punctuated by its categorical statement that evidence that tends to show impulsiveness and anti-social behavior will not be regarded by jurors as mitigating. *See, e.g.,* PCRA Court Opinion, *slip op.* at 14 (stating that the fact "that Petitioner's judgment [may have been] impaired and that his response to social judgment questions indicated that he would respond impulsively in stressful situations in a manner without regard for the consequences of his actions and their impact on others ... cannot be characterized as beneficial to petitioner"). This sort of reasoning, in my view, does not constitute fact finding tied to the individual circumstances of the case,

but rather, represents a philosophical position that is contrary to decisions of the United States Supreme Court that have recognized the potency of life-history and mental-health mitigation in terms of capital sentencing, *see, e.g., Wiggins,* 539 U.S. at 510, 123 S.Ct. at 2527; *Williams,* 529 U.S. at 396, 120 S.Ct. at 1495,[21] the ABA Guidelines, and the experience of the Defender Association of Philadelphia and other legal service providers in the capital arena which recognize the Guidelines' approach.

The PCRA court's position concerning the connotation of impulsivity or anti-social behavior arising out of the evidence is also highly superficial, in that it fails to take into account the reality that, in any capital trial in which guilt has been established, the jurors already are well aware that the defendant has engaged in impulsive, aberrant, and/or anti-social behavior. Indeed, the defendant has at least once perpetrated the ultimate act of this kind, *i.e.,* the unjustified killing of a human being with specific intent and malice. In this case, moreover, the Commonwealth had legitimately put before the jury not only Appellant's conviction for the present murder, but also a fairly extensive series of other serious violent felonies. Accordingly, there seems to me to have been little danger in an attempt to establish some broader context for Appellant's behavior in terms of mitigation, which was precisely trial counsel's role. In this regard, the role of life-history and mental-health mitigation evidence, where it is available, is not to try to excuse that behavior (which in any event will be subject to severe punishment),[22] but rather (and only) to

**21.** The majority distinguishes the United States Supreme Court's decision in *Williams* on the basis that the familial abuse present in *Williams* was substantially greater based on the fact that the parents had been incarcerated for it. *See* Majority Opinion at 97 n. 12, 863 A.2d at 521 n. 12. It cannot reasonably be disputed, however, that the type of conduct described in the evidence here was equally deserving of punishment (and/or treatment if the requisite culpability on the part of the perpetrators was not present), had intervention occurred. Moreover, it does not seem to me that the presence or absence of governmental detection and/or intervention should be deemed controlling.

**22.** *Accord* ABA GUIDELINES 10.11, commentary ("None of this evidence should be offered as a counterweight to the gravity of the crime, but

attempt to convey that there is some factor or factor that militates against the exercise of governmental power to extinguish the defendant's life.[23] Particularly as the General Assembly has recognized the presence of major mental or emotional infirmity as a specific category of mitigation, *see* 42 Pa.C.S. § 9711(e)(2), courts of law should be hard pressed to effectively rule them out categorically in instances in which they have been overlooked by counsel.[24]

The majority's reasoning overlaps with that of the PCRA court, and, for that reason, fails to persuade me. In addition, the majority absolves counsel of his failure to conduct further investigation into a documented psychotic episode and associated recommendation of psychiatric treatment, based on the absence of an indication of a previous psychiatric history. *See* Majority Opinion at 80–83, 863 A.2d at 519–20. In my view, however, neither the absence of any self-recognition or report-

rather to show that the person who committed the crime is a flawed but real individual rather than a generic evildoer[.]'').

**23.** *Accord Simmons v. Luebbers*, 299 F.3d 929, 938–39 (8th Cir.2002) (''By the time the state was finished with its case, the jury's perception of Simmons could not have been more unpleasant. Mitigating evidence was essential to provide some sort of explanation for Simmons's abhorrent behavior. Despite the availability of such evidence, however, none was presented. Simmons's attorneys' representation was ineffective.''), *cert. denied*, 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003); *Ainsworth v. Woodford*, 268 F.3d 868, 876 (9th Cir.2001) (indicating that the introduction of expert testimony in mitigation would also have been important to explain the effects that serious physical and psychological abuse and neglect as a child had on the defendant); ABA GUIDELINES 10.11, commentary (noting that expert testimony may explain the effects of mental impairments on the defendant's judgment and impulse control).

**24.** The PCRA court and the Commonwealth certainly are not incorrect in their assertion that some jurors may not view a pattern of violent and impulsive behavior arising from disassociation, repressed anger, and mental health infirmity as mitigating, no matter what the source or degree of the impairment. But it is equally undeniable, as experience has shown in capital cases, that some jurors will in some situations view this as mitigating, and, in our system of justice, it takes a single juror of twelve to avoid the imposition of a capital sentence. *See Wiggins*, 539 U.S. at 536–37, 123 S.Ct. at 2543 (explaining that the context in which courts are to review the prejudice prong of the ineffectiveness inquiry is in terms of whether ''there is a reasonable probability that at least one juror would have struck a different balance'').

ing on the part of a criminal defendant concerning a mental health diagnosis and/or a prior record of intervention and treatment controls the obligations of counsel who has or should have become aware of psychiatric involvement, particularly since those suffering from mental illness frequently remain untreated and unaware of psychiatrically recognizable illnesses. *See supra* note 8; *accord Averhart v. State,* 614 N.E.2d 924, 930 (Ind.1993) (finding capital defense counsel ineffective, *inter alia,* for naively placing undue emphasis on the contents of a pre-sentence report in terms of the production of his own case for mitigation).

In summary, I believe that the record paints a fairly stark picture of penalty-phase ineffectiveness of counsel, as it reflects an inadequate investigation and the making of strategic decisions and recommendations on an uninformed basis. Moreover, as I am unable to conclude that at least one juror might not have credited the mitigation that should have been presented in favor of life imprisonment and found its weight at least equal to the Commonwealth's case for death, I would award a new penalty hearing, or, at a minimum, remand for proceedings consistent with *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), were that to be deemed necessary by the Court.

Finally, on the issue of the availability of an instruction under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), I agree with the majority that *Simmons* is not retroactive in its application. *See* Majority Opinion, at 99 n. 15, 863 A.2d at 530 n. 15. I differ with the majority's indication that Appellant's future dangerous was not before the jury in this case, however,[25] as it does not appear to be in keeping with recent decisions of the United States Supreme Court. *See Kelly v. South Carolina,* 534 U.S. 246, 253–54, 122 S.Ct. 726, 731–32, 151 L.Ed.2d 670 (2002).

---

25. *See, e.g.,* N.T., Feb. 3, 1986, at 1876–77 (penalty-phase summation of the district attorney arguing that Appellant "terrorized, he robbed, he [p]lundered, and he killed, and he continued to kill.... I am asking you, ladies and gentlemen, to impose the death penalty because our system of justice must stop him. He must be stopped.").