**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 668 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | 09/28/2012 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at No. CP-51-CR-0823621- |
| | : | 1984, granting a Stay of Execution |
| | : | |
| TERRANCE WILLIAMS, | : | SUBMITTED:  August 25, 2016 |
| | : | |
| Appellee | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 669 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | 09/28/2012 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at No. CP-51-CR-0823621-1984 |
| | : | |
| | : | SUBMITTED:  August 25, 2016 |
| TERRANCE L. WILLIAMS, | : | |
| | : | |
| Appellee | : | |


## OPINION IN SUPPORT OF AFFIRMANCE


**JUSTICE DONOHUE**                                    **DECIDED:  August 22, 2017**

The Commonwealth appeals from the order of the Court of Common Pleas of

Philadelphia County granting the petition for relief filed by Appellee, Terrence Williams

("Williams") pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-46

("PCRA").  Because the certified record in this case amply supports the lower court's

findings that the Commonwealth willfully suppressed material exculpatory evidence, and

that this suppression of evidence prejudiced Williams during the penalty phase of his

trial, we affirm the PCRA court's determination that Williams' PCRA petition successfully asserted a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). We further affirm the PCRA court's decision to award Williams a new penalty phase trial.

In connection with a prior appeal, this Court offered the following brief summary of the facts underlying Williams' convictions of first degree murder, robbery and criminal conspiracy:

> On June 11, 1984, [Williams] and Marc Draper lost their money gambling on a street corner. [Williams] left to get money from the victim, Amos Norwood, and returned with $10. Later, Norwood drove up to the two. [Williams] told Draper they were going to take some money from Norwood, and the three men left in Norwood's car. [Williams] directed Norwood to a secluded area where he and Draper forced Norwood out of the car, bound and gagged him, and then took money and other items from him. [Williams], with a tire iron, and Draper, with a wrench, beat Norwood to death and fled. Later that night, [Williams] returned and burned the body.

*Commonwealth v. Williams*, 863 A.2d 505, 509 (Pa. 2004).

At trial in 1986, the Commonwealth offered the testimony of Mamie Norwood, the decedent's wife, and Reverend Charles Poindexter, the decedent's pastor, both of whom reviewed for the jury Amos Norwood's work with the youth in the church. N.T., 1/14/1986, at 60, 157-58, 140-41, 166-68, 172-74.[1] Based in part on this testimony, in her closing argument in the penalty phase, the prosecutor, Andrea Foulkes, argued to the jury that Norwood was a "kind" and "innocent" man who had done nothing more than offer Williams a ride home, and that Williams had brutally killed him just get a small

---

[1] Both Mamie Norwood and Reverend Poindexter testified during the guilt phase of the trial. The trial court allowed evidence from this phase to be considered in the penalty phase, which followed immediately thereafter.

amount of money and two credit cards. N.T., 2/3/1986, at 1873-76. At the time Prosecutor Foulkes made this argument, she knew that the Commonwealth's files contained multiple documents, some in her own handwriting, demonstrating that Amos Norwood was neither kind nor innocent, and that he was in fact a sexual abuser of young adolescents, perhaps including Williams. Without this information, which was not provided to defense counsel as required by *Brady*, the jury returned a death sentence.

This Court affirmed the judgment of sentence. *Commonwealth v Williams*, 570 A.2d 75 (Pa. 1990). On March 9, 2012, Williams filed his fourth PCRA petition, in which he alleged, based in part upon affidavits signed by Marc Draper, that, inter alia, (1) his trial counsel was ineffective for not introducing mitigating evidence at the penalty phase of his trial, and (2) the Commonwealth had suppressed evidence of statements made to Draper at the time of trial and promises made to him to induce his cooperation during trial. Judge Teresa Sarmina of the Court of Common Pleas of Philadelphia County ordered the Commonwealth to produce various discovery materials, including police homicide files for Williams' two murder convictions (Norwood and Herbert Hamilton) and all reports or notes relating to Draper or Norwood's sexual relationships with Williams or other children under the age of eighteen. On September 28, 2012, Judge Sarmina granted Williams' PCRA petition, vacated his death sentence and granted him a new penalty phase trial. This Court, by opinion dated December 15, 2014, vacated Judge Sarmina's order, dismissed the PCRA petition, and reinstated the death penalty. *Commonwealth v. Williams*, 105 A.3d 1234 (Pa. 2014). The United States Supreme Court, by opinion dated June 9, 2016, vacated our decision and remanded it back to this Court for further proceedings. *Williams v. Pennsylvania*, 135 S.Ct. 1899 (2016).

In her written opinion, Judge Sarmina issued a lengthy opinion that included numerous findings of fact, with credibility determinations based upon her observation of the two witnesses appearing at a September 2012 evidentiary hearing -- Prosecutor Foulkes and witness Marc Draper. As this Court has repeatedly held, the findings of a PCRA court are entitled to "great deference":

> The findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given great deference. We will not disturb the findings of the PCRA court if they are supported by the record, even where the record could support a contrary holding. *Commonwealth v. Sullivan*, 371 A.2d 468, 476 (Pa. 1977). This Court's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. *See, e.g., Commonwealth v. Meadius*, 870 A.2d 802, 805 (Pa. 2005).

*Commonwealth v. Jones*, 912 A.2d 268, 293 (Pa. 2006).

Based upon her exhaustive review of the evidence in the record, Judge Sarmina concluded that:

> [T]he Commonwealth suppressed multiple pieces of evidence, all of which shared a common feature: each strengthened the inference that Amos Norwood was sexually involved with boys around [Williams'] age at the time of his murder. The Commonwealth withheld one such statement entirely and turned over to the defense two "sanitized" statements… . [T]he government interfered with [Williams'] ability to present the claim that his due process right to a fair trial had been violated. This claim has not been waived, nor previously litigated, as it is based on information discovered in September 2012. The suppression of this evidence, which could have been used to develop and pursue an alternate theory at the penalty phase, undermines confidence in the jury's death sentence, thereby constituting a meritorious claim of a constitutional violation under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Cone v. Bell*, 556 U.S. 449 (2009).

PCRA Court Opinion, 11/27/2012, at 12-13 (footnotes omitted).

Judge Sarmina determined that the Commonwealth's decision to "sanitize" the witness statements of both Mamie Norwood and Reverend Poindexter interfered with Williams' ability to state a *Brady* claim until 2012:

> By scrubbing these statements of references to Mr. Norwood's sexual improprieties and then providing "clean" versions [to the defense and courts], the government created the false impression that [Williams] was given the full account of what these witnesses stated. That false impression hobbled [Williams'] ability to discover or develop a *Brady* claim rooted in information removed from the scrubbed statements. That false impression was maintained by the Commonwealth until the original statements were found [in September 2012] in the government's files and some in the very handwriting of the trial prosecutor ... . [T]hroughout the litigation of this case, the government has disputed the existence of information in their files about Amos Norwood's homosexual ephebophilia,[2] thus further interfering with [Williams] learning the facts that form the basis of the instant *Brady* claim.

*Id.* at 15.

Judge Sarmina concluded that Prosecutor Foulkes' actions were intentional and specifically designed to secure the death penalty she had failed to obtain in a prior death penalty case against Williams:

> In the Herbert Hamilton case ... Ms. Foulkes aggressively sought a first degree murder conviction and imposition of the death penalty ... . [T]he third degree verdict in the Hamilton case colored Ms. Foulkes' decisions when she prosecuted appellee for the murder of Amos Norwood. First, Ms. Foulkes identified what she believed to be the reason that the jury returned a "compromised" [third degree] verdict. And then she attempted to eliminate evidence which caused

---

[2]  The PCRA court defined "homosexual ephebophilia" as the psychological term describing the sexual attraction of adults to adolescents. PCRA Court Opinion, 11/27/2012, at 13 n.32 (citing Webster's New Encyclopedic Dictionary 610 (2002)).

the "compromised" verdict from being presented to the [Norwood] jury. ... The "sexual overtones and relationships," which she credited with leading the [Hamilton] jury to reach a compromise verdict, revolved around the fact that a middle-aged man may have been paying [Williams], still in his teens, for sex.

*     *     *

Ms. Foulkes admitted to this [c]ourt that her knowledge of [Williams'] sexual past created an obvious implication that his relationship with Amos Norwood was substantially similar to his relationship with Herbert Hamilton .... But Ms. Foulkes made certain that the jury did not see that sexual connection. When confronted about the existence of evidence supporting her own suspicion that Mr. Norwood had been sexually inappropriate with [Williams] at the PCRA hearing before this [c]ourt, Ms. Foulkes grossly misrepresented the evidence in the government's files.

PCRA Court Opinion, 11/27/2012, Appendix at 2-5.

Judge Sarmina found, as a matter of fact, that Prosecutor Foukles' actions created an important difference in the Hamilton and Norwood trials that contributed to the death sentence in the latter case:

The major difference between the Hamilton and Norwood cases is that evidence of a sexual relationship between the middle-aged victim and [Williams] was presented to the jury in the first, but not in the second. The [c]ourt is quite mindful that Ms. Foulkes had no duty to do the defense's job for them, and she had the right to present a different theory of the case that focused on a robbery of the victim and not on a relationship that existed or might have existed between the victim and appellee. However, she did have a duty to provide the defense with that evidence, because it was exculpatory and "material." The fact that a portion of Ms. Foulkes' penalty phase closing argument -- the culmination of prosecuting [Williams] for both the Hamilton and Norwood murders -- focused on an aspect of the evidence that could have been rebutted by the withheld information more than suggests that Ms. Foulkes was aware of the significance of what was brushed under the rug. This [c]ourt concluded that intentionally rooting that evidence out of the Norwood case

in order to secure a death penalty sentence amounted to "gamesmanship."

*Id.* at 7-8.

The Commonwealth's efforts to hide evidence of Amos Norwood's homosexual ephebophilia did not end with the 1986 trial. In a 1998 PCRA petition, Williams asserted a claim of ineffective assistance of counsel based upon the failure of trial counsel to introduce evidence of his sexual abuse as a child. Two witnesses, Donald Fisher and James Villarreal, attempted to offer testimony that Norwood had a reputation for sexually molesting young boys. N.T., 4/13/1998, at 602; N.T., 4/8/1998, at 225-32. The PCRA court interrupted and specifically asked counsel for the Commonwealth if there was any evidence regarding Norwood's molestation of young boys. N.T., 4/8/1998, at 237. Again, despite significant evidence in the Commonwealth's own files to the contrary, counsel for the Commonwealth advised the PCRA court that, other than Draper's trial testimony regarding the suggestion that he and Williams could extort money from Norwood, no such evidence existed.[3]  *Id.*  As a result of this false

---

[3]  The contention of the Opinion in Support of Reversal ("OISR") that the Commonwealth did not misrepresent the trial record, *see* OISR at 17 n.14, is contrary to both the certified record on appeal and Judge Sarmina's findings of fact. The exchange between the PCRA court and counsel for the Commonwealth was as follows:

> [The Commonwealth]: Well, Your Honor, I was only going to remind the [c]ourt that, in fact, there was evidence that this defendant knew some sort of dark secret about Mr. Norwood, because this case began as an extortion. He suggested to this co-defendant they knew - - that he knew something about Mr. Norwood which would enable them to extort money from Mr. Norwood and Mr. Norwood - -

> The Court: But there is nothing in this case involving Norwood's homosexuality or violation of young boys - -

> The Commonwealth: Well, that was the secret.

(continued…)

The Court: -- that accrued that was involved.

The Commonwealth: Oh, no, just that [Williams] knew about Norwood's behavior and was trying to extort money from it. It didn't work so it moved on to robbery and murder, so it was not a secret. It was not a secret to anyone at the time.

The Court: You may proceed.

N.T., 4/8/1998, at 237.

It is clear from the certified record that the basis for the extortion plot, i.e., the "secret" that Draper and Williams knew about Norwood, was that he was gay. In his original statement/confession to police, Draper indicated that to get money, Williams was going to tell Norwood's wife that "Amos was gay." N.T., 9/25/2012, Exhibit P-2. Prosecutor Foulkes referenced this extortion plot to tell Norwood's wife he was gay in her opening statement at trial, N.T., 1/14/1986, at 41, and Draper so testified to the jury during his trial testimony. N.T., 1/22/1986, at 667-68.

As the above exchange reflects, when the PCRA court asked counsel for the Commonwealth if there was any evidence about "Norwood's homosexuality or violation of young boys," counsel responded by referencing the "secret" and stating "Oh, no, just that [Williams] knew about Norwood's behavior and was trying to extort money from it." As the record reviewed above demonstrates, the "secret" behind the extortion plot was merely that Norwood was gay, not that he was a homosexual ephebophile. Read in context, the only plausible understanding of counsel's answer was that he was misrepresenting to the PCRA court that **the only evidence responsive to the question** was that there was evidence of "Norwood's homosexuality," but there was no evidence of Norwood's "violation of young boys."

Counsel for the Commonwealth, when directly confronted with the question of whether there was any evidence in the record regarding Norwood's "violation of young boys," misinformed the PCRA court that there was no such evidence (even though this evidence was in the Commonwealth's files at that time). Judge Sarmina found, as a matter of fact based upon the above-cited evidence of record, that this statement constituted an "affirmative misrepresentation" of the evidence. PCRA Court Opinion, 11/27/2012, at 16 n.34-35.

As delineated above, supra at 3, our scope and standard of review precludes this Court from engaging in its own fact-finding efforts in contradiction to those of the PCRA court. Instead, this Court must show deference to a PCRA court's findings of fact, so long as they are supported by evidence of record, viewed in the light most favorable to the prevailing party (here, Williams), even where the record could also support a contrary holding. *Commonwealth v. Jones*, 912 A.2d 268, 293 (Pa. 2006); *Commonwealth v.*
(continued…)

representation by counsel for the Commonwealth, the PCRA court indicated that it would not consider the testimony of Fisher or Villarreal because it lacked any corroborating detail. N.T., 4/13/1998, at 602 ("I will not consider it as a fact unless … [t]here would have to be evidence of it and, in other words, what was seen, when it was seen, who was present, who was involved. A statement by any witness of this nature doesn't have much credibility or impact … ."). In its subsequent opinion denying Williams' PCRA claim, the PCRA court did not even mention Fisher's or Villarreal's testimony[4] and, clearly agreeing with the Commonwealth's attacks on the credibility of any evidence suggesting a sexual component to Norwood's murder, discounted Williams' mental health testimony. PCRA Court Opinion, 1/13/1999, at 14-15.

Judge Sarmina made the following findings of fact regarding the 1998 evidentiary hearing:

> At the 1998 evidentiary hearing ... the government intervened as [Williams] attempted to put forth evidence that Amos Norwood had been sexually abusive towards young boys, including [Williams] ... [although p]recisely the evidence that [the PCRA court] asked for was sitting in the government's files. Without that evidence, the [PCRA court] forcefully attacked the relevance of testimony proffered by the defense as to any potential sexual impropriety in Norwood's past. Based on the Commonwealth's affirmative misrepresentation that there was nothing else in the case

_____

(…continued)
*Meadius*, 870 A.2d 802, 805 (Pa. 2005); *Commonwealth v. Sullivan*, 371 A.2d 468, 476 (Pa. 1977).

[4] Without citation, the OISR represents that the PCRA court accepted the testimony of Fisher and Villarreal "as evidence of what was available to the defense in its preparation for trial." OISR at 19 n.15. Even if true (the PCRA court did not reference Fisher or Villarreal in its opinion), this further highlights that the only "evidence" available to the defense was, at best, unsubstantiated hearsay -- which could have been corroborated by and through the suppressed evidence in the Commonwealth's files.

involving Norwood's "homosexuality or violation of young boys," [the PCRA court] prevented both lay witnesses and expert witnesses from developing that issue.

PCRA Court Opinion, 11/27/2012, at 16-17.

In subsequent appellate and federal habeas proceedings, the Commonwealth attacked the very suggestion that Norwood had ever molested anyone (including Williams), insisting that it was not supported by any evidence and constituted nothing more than desperate and incredible fabrications to overturn a death penalty. On direct appeal to this Court, the Commonwealth attacked the credibility of the lay and expert testimony, claiming that any suggestion of a sexual relationship between Williams and Norwood was merely "self-serving accounts … made by the defendant, his family and friends," and that the "conclusions drawn by the defense experts were completely undermined by their unwavering trust in the[se] self-serving accounts." *Commonwealth v. Williams*, No. 247 CAP, Commonwealth's Brief at 25. This Court rejected Williams' appeal. *Commonwealth v. Williams*, 863 A.2d 505 (Pa. 2004).

In the federal courts, the Commonwealth continued to attack any suggestion that Norwood had a history of sexual abuse of adolescences as "outrageous" and lacking in any supporting evidence. *Williams v. Beard*, No. 05-3486 (E.D. Pa. 2006) (Commonwealth's Response to Penalty-Phase Claims at 81). The district court agreed, concluding that Williams' evidence deserved no weight because it was based on nothing but Williams' own "self-serving information." *Id.* at 100.

The Commonwealth successfully employed the same strategy in the Third Circuit, which held that if Williams' trial counsel had presented mental health experts to testify that physical and sexual abuse by older men and family members during his

adolescence had resulted in psychological damage at the time of Norwood's murder, this evidence would have been offset by conflicting evidence from Commonwealth experts that Williams was not suffering from any psychosis at the time of the murder. *See Williams v. Beard*, 637 F.3d 195, 233-35 (3d Cir. 2011). In ruling that Williams had not demonstrated prejudice, the Third Circuit indicated that the Commonwealth had "assail[ed]" allegations of sexual abuse as unsupported by any evidence and that, to the contrary, "all of the sexual abuse testimony is based upon statements provided in anticipation of the PCRA hearing." *Id.* at 229 n.26. The Third Circuit agreed, stating that "the Commonwealth's point is well taken and we will factor it into our prejudice analysis accordingly." *Id.*

At no time did the Commonwealth advise any of these courts (including this Court) that it had evidence in its files that would corroborate claims that Norwood suffered from homosexual ephebophilia. This information was not revealed until Marc Draper, who participated in Norwood's murder with Williams, agreed, for the first time in light of Williams' approaching execution date, to come forward to offer his knowledge of the relationship between Williams and Norwood and his interaction with Prosecutor Foulkes at trial. In an affidavit, Draper stated as follows:

> 8. I also told the prosecutor, Ms. Foulkes, that this case was about Mr. Norwood having sex with Terry. She was our prosecutor, me and Terry. She is the one who wrote the letter for me to the parole board. I sent this letter to Mr. Montroy at the end of August. I had prep sessions with Ms. Foulkes. I specifically remember meeting with her at her office. I remember the detectives taking me to her office, but other than Ms. Foulkes, I can't recall who else was present during the sessions. Neither Ms. Foulkes nor the police wanted to hear anything about the case having to do with Norwood having sex with Terry. They did not want me to talk about or testify about the things that I have talked about

in this and my other declarations. In fact, I specifically remember [d]etectives telling me that information I gave them was not credible. They did not want me to say the case involved a relationship. They wanted me to say it was only a robbery. Ms. Foulkes made it clear with me that I had to stick to the story that this case was only about a robbery. I followed what they told me and stuck to it over the years. But it was obvious to me that Terry snapped at the time of the incident. I described this in my January declaration. I told Ms. Foulkes and the detectives about Terry "snapping" during the incident. I remember telling Ms. Foulkes about this the day that the [d]etectives picked me up at Holmesburg. It was odd because they walked me right down the street in Center City to the DA's office - through people and traffic. I told them about Terry snapping at the time Norwood was killed, and that his snapping was because of the relationship they had.

PCRA Court Opinion, 11/27/2012, Attachment B (Draper Affidavit, ¶ 8). At the evidentiary hearing in September 2012, Draper testified that Prosecutor Foulkes threatened to charge him with another (unsolved) murder, that of Donna Friedman, if he did not testify as instructed. N.T., 9/20/2012, at 177-78. In her subsequent written opinion, Judge Sarmina found Draper to be a credible witness. PCRA Court Opinion, 11/27/2012, at 5 n.14, 22-23.

At the September 2012 evidentiary hearings, the evidence showed that Reverend Poindexter had reported Norwood's sexual improprieties to the police. A police activity sheet, dated June 22, 1984, documents that Reverend Poindexter "related in confidence that the deceased may have been a homosexual, and that he in fact had received a complaint about five years ago from the mother of a 17-year-old parishioner that deceased had propositioned the 17-year-old for sex (male)." N.T., 9/25/2012, Exhibit P-24. This report was not revealed to Williams until September 2012 when the police files were ordered to be produced. The witness statement of Reverend

Poindexter provided to defense counsel at trial had been "sanitized" to remove all mentions of homosexuality or the police report. *Id.*, Exhibit C-2, Item 19.

The hearing evidence also reflected that Mamie Norwood had reported to police information about Norwood's homosexual involvement with a teenage boy. According to the police activity sheet, Mamie Norwood told police about a strange incident when her husband woke her at 2:00 a.m. to ask for money, and she saw a "'young male, slim' standing silently in the hallway of her home." *Id.*, Exhibit P-24. Her husband loaded stereo equipment into his car, drove off with the young man, and "returned home around 9-10 a.m. the next day and told her a 'rambling' story of being 'abducted," and "pleaded with her not to get the police involved." *Id.* As with Reverend Poindexter, Mamie Norwood's witness statement provided to defense counsel at trial completely omitted this information. *Id.*, Exhibit C-2, Item 17.

Third, Prosecutor Foulkes' own files showed her knowledge that the mother of Ronald House, a 16-year-old boy in Amos Norwood's church, reported to law enforcement officials about Mr. Norwood's pedophilia. N.T., 9/20/2012 (PM), Exhibit Court-2. Prosecutor Foulkes' own notes reflect that she learned that Ronald House had been groped "on privates" by Mr. Norwood, and that there were other "possible incidents." *Id.* This information was not provided to the defense until September 2012. N.T., 9/25/2012, Exhibit C-2.

Judge Sarmina ruled that Williams' *Brady* claim was timely under the governmental interference exception to the PCRA's time bar. PCRA Court Opinion, 11/27/2012, at 19 & n.40 (citing 42 Pa.C.S. § 9545(b)(1)(i)). She first determined that "[b]y removing direct and indirect evidence which demonstrated that Amos Norwood

had homosexual relationships with teenage boys from the statements that were turned over to the defense, the government interfered with" Williams' ability to assert a *Brady* claim. N.T., 9/28/2012, at 16. "It became clear for the first time in September 2012 that the Commonwealth made incomplete disclosures to defense counsel at the time of trial, and that the government's representations to the 1998 PCRA court were, in fact, misrepresentations." PCRA Court Opinion, 11/27/2012, at 18. Next, Judge Sarmina ruled that Williams filed his *Brady* claim within sixty days of the first date on which it could have been filed. *Id.* at 18-19 (citing 42 Pa.C.S. § 9545(b)(2)). Finally, Judge Sarmina concluded that the *Brady* claim had not been waived or previously litigated, as there "was no prior proceeding in which [Williams] could have raised the claim that the government suppressed evidence that Draper had been pressured to call the crime a robbery-gone-wrong, or the claim that the government suppressed evidence of the victim's homosexual ephebophilia, as the latter evidence was uncovered in September 2012." *Id.* at 24. No amount of due diligence could have uncovered the Commonwealth's interference, as (until September 2012) its files were not available to Williams and Draper had consistently refused to cooperate with Williams' attorneys. *Id.* at 19-23.

With respect to the merits of Williams' *Brady* claim, Judge Sarmina determined that the Commonwealth had suppressed multiple pieces of information, including the sanitized witness statements of Mamie Norwood and Reverend Poindexter, the police report regarding Ronald House, and Marc Draper's statements regarding the true motivation for the crime. *Id.* at 25-26, 41. This evidence was favorable to the defense, as it could have been used to cross-examine Mamie Norwood and Reverend

Poindexter, and Ronald House could have been called during Williams' case-in-chief in in the penalty phase to demonstrate further that Norwood was a homosexual ephebophile. *Id.* at 34-39. This testimony, in turn, could have provided defense counsel with a basis for contradicting Prosecutor Foulkes' closing argument that Norwood was a "nice" and "innocent" man. *Id.* at 38. Moreover,

> [a] reasonable defense attorney would have highlighted how Mr. Norwood's pattern of impropriety was a "circumstance of [this] offense," offering a reason to view [Williams] through a mitigating lens. Having established that there is "some" evidence of a mitigating circumstance, a trial judge "shall" instruct the jury on that mitigating circumstance. 42 Pa. C.S. § 9711(c)(1)(ii). When viewed in combination with the details of the crime, evidence of Mr. Norwood's prior improprieties would cast this offense in an entirely different light; the withheld evidence credits and corroborates [Williams'] own account of having been victimized by Mr. Norwood.

*Id.* at 37.

Finally, Judge Sarmina ruled that the evidence was material and that its suppression was prejudicial to Williams:.

> [D]uring the penalty phase, reasonable defense counsel would have re-called Reverend Poindexter, questioning the Reverend about the basis of his belief that Mr. Norwood was a homosexual, that Mr. Norwood had used his position at the church to surround himself with adolescent boys ..., and that complaints had been lodged about Norwood's sexual advances on some of those boys. That testimony would have changed at least one juror's view of Mr. Norwood. It would have been natural to second-guess whether Mr. Norwood intended to engage in a sexual act with Mr. Williams on the night of the murder. Viewed through that lens, reasonable defense counsel would also have re-called Mamie Norwood in order to highlight the parallels between the decedent's actions on the night of the killing and the night in which Mr. Norwood brought a "young male, slim" into his home, then drove that person away in his car and did not return until the next morning ... . The similarities between

the night of the murder and the previous suspicious late-night activity with an adolescent boy supports the argument that Mr. Williams was another one of Norwood's teenage sexual targets. And finally, Mr. Williams would have called Ronald House to testify that when he and Mr. Norwood were alone, Mr. Norwood propositioned him for sex and touched his genitals.

*Id.* at 50-51.

The OISR concludes that Williams' PCRA petition was not timely filed because Williams knew of Norwood's homosexual ephebophilia before 2012, and thus could have presented his claim sooner. OISR at 15. The OISR further contends that Williams "did present this argument at the 1998 PCRA hearing." *Id.* at 16. There are at least two significant problems with these arguments. First, the OISR fails to recognize that Williams' 2012 PCRA petition asserts a *Brady* claim, the first of its kind in the long procedural history of this case. Because the Commonwealth's suppression of evidence did not come to light until 2012, no *Brady* claim could have been asserted until then, as Williams had no knowledge of the suppression of this information and could not have gained said knowledge through the exercise of due diligence. Second, even if Williams were required to show that he had no knowledge Norwood's homosexual ephebophilia to assert a *Brady* claim under the governmental interference exception, which as a matter of law he is not, the record contains no evidence that Williams had any such knowledge.

The OISR's focus on the facts encompassed within the suppressed evidence (namely, Norwood's homosexual ephebophilia) reflects that it is improperly analyzing timeliness under section 9545(b)(1)(ii), rather than under section 9545(b)(1)(i). Section 9545(b)(ii) provides an exception when the "facts on which the claim is predicated were

unknown to the petitioner."  42 Pa.C.S. § 9545(b)(1)(ii).  Section 9545(b)(1)(i), in significant contrast, provides an exception when the "failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States."  42 Pa.C.S. § 9545(b)(1)(i).  In other words, section 9545(b)(1)(i) provides an exception to the one year time bar when there has been an **unconstitutional interference by government officials**, i.e., a *Brady* claim.  This Court has explained that

> a *Brady* violation may fall within the governmental interference exception[.  T]he petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence. … [Section] 9545(b)(1)(ii)'s exception does not contain the same requirements as a *Brady* claim... .

*Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008) (citations omitted); *Commonwealth v. Howard*, 788 A.2d 351, 355 (Pa. 2002) ("[W]here a petitioner alleges that a District Attorney's failure to produce documents amounts to governmental interference, then that petitioner must identify a specific claim that he was unable to discover or develop due to the District Attorney's conduct."); *Commonwealth v. Breakiron*, 781 A.2d 94, 98 (Pa. 2001) ("a properly plead *Brady* claim may fall within the governmental interference exception").

Accordingly, to satisfy the governmental interference exception, the petitioner must demonstrate (1) that interference by governmental officials prevented him from discovering and bringing his *Brady* claim sooner, and (2) that he could not have known of the governmental interference earlier through the exercise of reasonable diligence.

*Abu-Jamal*, 941 A.2d at 1268. As detailed herein, Williams satisfied these requirements in this case. *See supra*, pp. 10-11. There is no question that the Commonwealth suppressed the evidence that forms the basis for Williams' *Brady* claim. Moreover, Williams did not know that the Commonwealth had suppressed this evidence until 2012. Williams could not have learned about the suppression of evidence earlier through the exercise of due diligence, as he had no access to the Commonwealth's files until Marc Draper came forward in 2012 with his affidavits, which resulted in the discovery orders that finally revealed the Commonwealth's suppression of evidence.

In addition, Williams had no access to the information that had been suppressed.

> The evidence that the Commonwealth withheld was that Amos Norwood had engaged, or may have engaged, in inappropriate sexual behavior with other teenage boys in the past. [Williams] obviously would have known about prior sexual encounters that **he** had had with Mr. Norwood. But evidence that Mr. Norwood touched Ronald House's genitals, that Reverend Poindexter had received at least one complaint about a specific instance in which Mr. Norwood was sexually inappropriate with a teenage male, and that Mr. Norwood's wife awoke in the middle of the night as her husband left the house with a "young male, slim" and later related a bizarre story to her, was undoubtedly beyond the scope of [Williams'] conceivable knowledge.

PCRA Court Opinion, 11/27/2012, at 31-32 (emphasis in original).[5]

---

[5] Responsive to the OISR's various contentions regarding due diligence, *see, e.g.,* OISR at 12 & n.12, the PCRA court found as a matter of fact, and the certified record supports, that prior to 2012, Williams could not have learned through the exercise of due diligence that the Commonwealth had suppressed the exculpatory evidence that forms the basis for the present *Brady* claim. Likewise, the PCRA court found, and the certified record supports, that Williams had no access to the specific information contained in the suppressed evidence (including the report of the touching of Ronald House's genitals and the sanitized portions of the witness statements of Reverend Poindexter and Norwood's wife), and he could not have discovered this information through the exercise of due diligence.

The OISR's contention that Williams already knew about Norwood's homosexual ephebophilia before 2012, and that he in fact "presented a claim that Norwood was a homosexual ephebophile" in 1998, is not supported by the evidentiary record. The OISR cites to Draper's trial testimony that on the night of the murder, Williams told him that Norwood was a homosexual and that they could use this information to extort money from him. OISR at 15. The OISR also points to Draper's testimony that he taunted Norwood at the scene of the murder by telling him, "oh, you like boys." *Id.* Judge Sarmina found as a matter of fact, however, that this evidence is fundamentally different from the evidence that the Commonwealth suppressed. Draper's testimony went only to Williams' knowledge of Norwood's sexual **orientation**, not to his proclivity to **molest adolescents**. PCRA Court Opinion, 11/27/2012, at 16 n.34.

The OISR also reviews the expert testimony presented by Williams at the 1998 PCRA evidentiary hearing, but does not identify any testimony by either of the three experts suggesting that Norwood was a homosexual ephebophile. OISR at 16-17. With respect to Dr. Kessel, the OISR notes that Williams told him that he had been sexually molested by a male teacher on several occasions, and that he had feelings of rage towards males who made him feel sexual. *Id.* at 16. The OISR also indicates that Dr. Kessel alluded to sexual relations between Williams and other men, including Herbert Hamilton. *Id.* Finally, the OISR notes that Dr. Kessel testified, "If there was a sexual component to Williams' relationship with Norwood," it would have "substantially contribute[d] to a reduction in his ability to control his impulses around somebody who would make or whom he would interpret to make an advance." *Id.* The OISR fails to note that because all evidence of Norwood's homosexual ephebophilia had been

suppressed, the PCRA court immediately advised Dr. Kessel, "Well there wasn't, I don't think." N.T., 4/8/1998, at 159. Contrary to the OISR's suggestion, Dr. Kessel did not testify that Williams ever advised him that he was aware that Norwood had sexual relationships with other teens.

The OISR also references testimony from two other experts, Drs. Fleming and Kaufman, again suggesting, without any support in the record, that their testimony reflects Williams' knowledge of Norwood's sexual encounters with other teenagers. OISR at 16-17. According to the OISR, Dr. Fleming testified that Williams' decision to burn Norwood's body reflected that it was a crime of rage, and that Williams' threat to expose Norwood's sexual orientation likely contributed to Williams' motive. *Id.* at 16. Likewise, Dr. Kaufman testified that Williams told him he was angry with Norwood after "there was some talk that they were going to be involved in sexual activity," and that it was "implied" that Williams was angry about abuse by Norwood. *Id.* at 16-17. Again, however, neither Dr. Fleming nor Dr. Kaufman testified that Williams knew about by sexual activities between Norwood and other teenage boys.

Finally, the OISR cites to the testimony of James Villarreal[6] and Donald Fisher, but does not mention either the Commonwealth's misrepresentations to the PCRA court

---

[6] Surprisingly, the OISR references Villarreal's testimony that he had not been contacted by Williams' defense counsel to testify at trial. OISR at 18. The present PCRA petition includes no claim of ineffectiveness for failing to call particular witnesses at trial.

Notably, however, one could plausibly argue that the Commonwealth's suppression of evidence of Norwood's homosexual ephebophilia negatively affected defense counsel's preparation for trial, since counsel, without any knowledge of Norwood's proclivities towards other adolescents, would have had no reason to interview potential witnesses to obtain additional proof of the same to present at trial. Absent the false impression (continued…)

in response, the PCRA court's decision to ignore the testimony, or Judge Sarmina's subsequent findings of fact. OISR at 17-19. When Villarreal testified that he had heard from others about Norwood's activities with teenage boys, the PCRA court immediately asked counsel for the Commonwealth if there was any evidence in the record "involving Norwood's homosexuality or violation of young boys." N.T., 4/8/1998, at 237. Counsel for the Commonwealth responded that other than Draper's testimony regarding a possible attempt to extort money from Norwood, there was no such evidence. *Id.* When Fisher offered his testimony about Norwood's relationship with Williams, the PCRA court refused to consider it based upon Fisher's mere assertion with no factual support for its accuracy. *Id.*

In its subsequent written opinion denying Williams' 1998 PCRA petition, the PCRA court not only did not credit the testimony of Villarreal and Fisher, it did not even mention it. As Judge Sarmina found, the reason for this was the Commonwealth's intentional misrepresentation that there was no evidence to support any claims of sexual abuse by Norwood:

> Precisely the evidence that [the PCRA court] asked for was sitting in the government's files. Without that evidence, the Court forcefully attacked the relevance of testimony proffered by the defense as to any sexual impropriety in Norwood's past. Based on the Commonwealth's affirmative representation that there was nothing else in the case involving Norwood's "homosexuality or violation of young boys," [the PCRA court] prevented both lay witnesses and expert witnesses from developing that issue.

PCRA Court Opinion, 11/27/2012, at 16-17.

---

(…continued)
created by the Commonwealth's suppression of evidence, defense counsel may well have sought out witnesses like Villarreal.

In sum, Judge Sarmina found, as a matter of fact, that the Commonwealth, both by suppressing the evidence in 1986 and then by misrepresenting the evidence again in 1998, prevented Williams from asserting a *Brady* claim until 2012. *Id.* The OISR has pointed to no evidence in the certified record to contradict this finding of fact. Williams did not assert a *Brady* claim in 1998, as he had no knowledge of the Commonwealth's suppression of evidence at that time. Instead, he asserted his first, and only, *Brady* claim in 2012, when he first learned of the basis for that claim. As a result, his PCRA petition in 2012 asserting a *Brady* claim was timely filed under the governmental interference exception in section 9545(b)(1)(i) of the PCRA.

Because we find that Williams' PCRA petition was timely filed, we next address the merits of his *Brady* claim. Based upon my review, Judge Sarmina's findings with respect to the *Brady* claim are adequately supported by evidence of record. This Court set forth the elements of a *Brady* claim in *Commonwealth v. Willis*, 46 A.3d 648 (Pa. 2012):

> [T]his Court has explained that, in order to establish a *Brady* violation, a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *See Commonwealth v. Lambert*, 471, 884 A.2d 848, 854 (Pa. 2005); *Commonwealth v. Collins*, 888 A.2d 564, 577–78 (Pa. 2005). However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. Chambers*, 807 A.2d 872, 887 (Pa. 2002) (citation omitted and emphasis added). Rather, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 29, 807 A.2d at 887–88 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3375).

*Id.* at 656; *see also Commonwealth v. Weiss*, 81 A.3d 767, 783-84 (Pa. 2013); *Commonwealth v. Lesko*, 15 A.3d 345, 370-71 (Pa. 2011).

The first two elements are clearly satisfied in this case. First, as described hereinabove, the Commonwealth willfully suppressed multiple items of evidence, including the sanitized witness statements of Mamie Norwood and Reverend Poindexter and the report about Ronald House. Second, the evidence could have been used to cross-examine Mamie Norwood and Reverend Poindexter and impeach their testimony regarding Norwood's positive work with youth at his church, contending instead that Norwood used his position in the church to identify sexual encounters with teenage boys. Calling Ronald House to testify in Williams' case-in-chief in the penalty phase of trial would have further strengthened this theory and would likewise have provided defense counsel with strong grounds to rebut the Commonwealth's closing argument that Norwood was a "kind" and "innocent" man while Williams was a cold-blooded killer. In this regard, defense counsel could also have compared Williams to Norwood's other victims, thus eliminating the perception that he killed Norwood for a small amount of money and credit cards. *See Simmons v. Beard*, 590 F.3d 223, 238 (3d Cir. 2009) ("Without the evidence suppressed by the prosecution, however, the defense could not credibly proffer such a theory. Had this information been available to the defense before trial, it could have much more effectively attacked the Commonwealth's case... .").

Finally, the OISR contends that Williams made a "strategic decision" to testify that he did not participate in Norwood's murder, rather than to tell the jury about his "own knowledge that Norwood had paid him for homosexual favors and that the two had a history of homosexual relations." OISR at 20-21. As Judge Sarmina properly noted, however, without other examples of Norwood's abuse of teens, Williams' testimony "would have merely seemed like an attempt by [Williams] to sling mud on the victim's character" and would have been incredible to the jury. PCRA Court Opinion, 11/27/2012, at 33. On the other hand, with multiple victims to substantiate Norwood's status as a homosexual ephebophile, defense counsel could potentially have convinced Williams not to take the stand (as he did) and deny that he had ever met Norwood. *See Commonwealth v. Carson*, 741 A.2d 686, 689 (Pa. 1999) ("It is well settled that the decision to testify on one's behalf is ultimately to be made by the defendant after full consultation with counsel."). Instead, defense counsel may have been able to convince Williams to testify at the penalty phase and tell the jury about his prior abuse at Norwood's hands.

With respect to the third element of a *Brady* claim, materiality and prejudice, the Commonwealth's multiple *Brady* violations leave little room for confidence in the jury's decision to sentence Williams to death. In her closing argument at the penalty phase of the trial, Prosecutor Foulkes told the jury:

> [Y]ou know the horrible circumstances of the death of Amos Norwood. You know that the defendant, Terrence Williams, for no reason but that a kind man offered him a ride home, that he and another man tied him up in the darkness of a cemetery, and beat him to death, squashed him like a bug that you might be irritated with against the windshield, beat him with two blunt instruments.

N.T., 2/3/1986, at 1873. Prosecutor Foulkes then cast Norwood as a helpless victim unable to protect himself from Williams:

> [Williams] has taken two lives, two innocent lives of persons who were older and perhaps unable certainly to defend themselves against the violence that he inflicted upon them. He thought of no one but himself, and he had no reason to commit these crimes.

*Id.* at 1876-77.

With the suppressed evidence in hand, defense counsel could have effectively rebutted these closing arguments by emphasizing, credibly, that Norwood was in fact an abuser of teenage boys, possibly including Williams. In so doing, defense counsel could have argued that Williams feared that Norwood intended to abuse him at the cemetery and that his judgment was thus substantially impaired. So viewed, the jury could have found that these circumstances of the crime were a mitigating factor. 42 Pa.C.S. § 9711(c)(8) (allowing a defendant to introduce "[a]ny other evidence … concerning … the circumstances of his offense."). The jury may also have considered this evidence to provide a better explanation for Williams' brutal behavior on the night in question, specifically as a crime of rage against Norwood, a sexual abuser, rather than as a coldly calculated act for nothing more than petty greed. Defense counsel could have portrayed Norwood as a victimizer of both Williams and others and developed the argument that Norwood's abusive behavior impaired Williams' judgment on the night of the murder. With the evidence of Norwood's homosexual ephebophilia before the jurors, they may well have believed Marc Draper's testimony that Williams "snapped" at the time of the killing, and that this "snapping" was the result of Norwood's prior abusive conduct. PCRA Court Opinion, 11/27/2012, Attachment B (Draper Affidavit, ¶ 8).

Mirroring the OISR's arguments about Williams' "strategic decision" to testify, the Commonwealth insists that the suppressed evidence was contrary to Williams' actual defense at trial. Commonwealth's Brief at 43-48 (citing N.T., 1/27/1986, at 1253). The Commonwealth contends that Williams insisted on testifying, despite defense counsel's advice to the contrary, because he repeatedly demanded a defense that could result in an acquittal. *Id.* In this regard, the Commonwealth further notes that Williams rejected his counsel's advice to accept a pre-trial plea offer of a life sentence in exchange for a guilty plea. *Id.* at 47.

The Commonwealth's arguments rely on two misstatements of applicable law. First, the Commonwealth cites to *United States v. Agur*, 427 U.S. 97 (1976), for the proposition that a prosecutor's failure to disclose exculpatory evidence violates a defendant's due process rights only if "the omitted evidence creates a reasonable doubt that did not otherwise exist," and rejecting as inconsistent with *Brady* a standard that would "focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial." Commonwealth's Brief at 36 (citing *Agur*, 427 U.S. at 112 & n.20). In *Willis*, however, this Court, relying on Supreme Court precedent that post-dates *Agur*, including *United States v. Bagley*, 473 U.S. 667 (1985), held that nondisclosed information may be material if it affects the defense's preparation for trial. *Willis*, 46 A.3d at 670. Accordingly, in deciding whether suppressed evidence was prejudicial, courts may in fact consider whether disclosure could have resulted in different trial preparation and trial strategy.

Second, the Commonwealth's focus on what Williams **would** have done if the suppressed evidence had been disclosed is also inaccurate. *See* Commonwealth's

Brief at 45 n.13 ("the mere possibility that counsel would have advised defendant not to testify is inconsequential absent proof that defendant would have accepted that advice") (citing *Agur*). In *Bagley*, the Supreme Court held that undisclosed evidence is material under *Brady* when, "if disclosed and used effectively, it might make a difference." *Bagley*, 473 U.S. at 676. In *Willis*, this Court interpreted *Bagley* to require prosecutors to produce all evidence that "**could** have been used by the defense to impeach prosecution witnesses." *Willis*, 46 A.3d at 653 (emphasis added). As such, rather than follow the Commonwealth's proposed analysis of attempting to speculate as to what Williams **would** have done if the information had been disclosed, the proper course is to conduct an objective analysis as to what capable defense counsel **could** have done with the suppressed evidence to achieve a contrary result at trial.

In the present case, Judge Sarmina conducted just such an analysis. She concluded that Williams' defense counsel could have cross-examined Mamie Norwood and Reverend Poindexter regarding their knowledge of Norwood's "sexual improprieties," and could have called Ronald House as a witness in the penalty phase to strength an argument to counter the Commonwealth's characterization of Norwood as "kind" and "innocent" man during its closing argument. PCRA Court Opinion, 11/27/2012, at 37-39. Focusing on Norwood's sexual improprieties, defense counsel could also have cast the murder in a different light, namely as a mental (or psychotic) "snap" of anger and rage in response to Norwood's abuse of Williams and others, which in turn could have led one or more jurors to find a mitigating circumstance to explain Williams' actions. *Id.* at 50-51.

For these reasons, the September 28, 2011 order of the PCRA court granting a stay of execution and ordering a new penalty phase trial is affirmed. The matter is remanded to the Court of Common Pleas of Philadelphia County for a new penalty phase trial.[7]

Justice Wecht joins this Opinion in Support of Affirmance.

---

[7] Williams' ancillary motions are denied as moot.